KESTENBAUM v MICHIGAN STATE UNIVERSITY

Docket No. 65473. Argued October 14, 1981 (Calendar No. 14).—
Decided December 7, 1982. Rehearing denied 417 Mich 1103.

Lawrence Kestenbaum brought an action under the Freedom of
Information Act against Michigan State University and Dale
Arnold, the university's designated freedom of information
officer, seeking to compel the release of a duplicate of a mag-
netic computer tape used to produce the university's student
directory. The plaintiff stated that he wanted the tape for
political mailings in connection with the November, 1978,
election. The university had denied his request on the ground
that the information contained on the tape was exempted from
disclosure because it was within the scope of the Family Educa-
tional Rights and Privacy Act. The Ingham Circuit Court,
Michael G. Harrison, J., ordered the university to create a
duplicate tape for the plaintiff's use, on the stipulation of the
plaintiff deleting all information except the students' names
and addresses, and directed that the plaintiff use the informa-
tion only for political mailings and return the tape after the
election. The plaintiff was denied costs, fees, and damages
because the university's refusal had not been arbitrary or
capricious. The Court of Appeals, R. B. Burns, P.J., and D. E.
Holbrook, Jr., and Glennie, JJ., affirmed the denial of attorney
fees and costs, but reversed the trial court's decision that the
plaintiff was entitled to the tape on the ground that the
Freedom of Information Act protects against a clearly unwar-

REFERENCES FOR POINTS IN HEADNOTES

[1, 8, 9] 66 Am Jur 2d, Records and Recording Laws § 40.
[2, 3, 5, 6, 14, 15] 66 Am Jur 2d, Records and Recording Laws § 32 *et seq.*
[4] 66 Am Jur 2d, Records and Recording Laws § 44.
[7] 66 Am Jur 2d, Records and Recording Laws § 1 *et seq.*
[10] 66 Am Jur 2d, Records and Recording Laws § 33.
[11, 13] 66 Am Jur 2d, Records and Recording Laws § 36 *et seq.*
[12, 16] 66 Am Jur 2d, Records and Recording Laws § 14.
[15] 66 Am Jur 2d, Records and Recording Laws § 13.
[17] 66 Am Jur 2d, Records and Recording Laws § 43.

ranted invasion of an individual's privacy, and stated that release of the tape would contravene the constitutional prohibition against using public funds for a private purpose (Docket No. 43048). The plaintiff appeals.

The judgment of the Court of Appeals was affirmed by an equally divided Court.

Chief Justice Fitzgerald, joined by Justices Williams and Coleman, would hold that the university was justified in denying the plaintiff's request for release of the magnetic tape containing the names and addresses of students because disclosure in that form would constitute a clearly unwarranted invasion of an individual's privacy. The reasoning which supports the university's limited invasion of privacy by publishing a student directory for the purpose in the public interest of easing communications within the campus community cannot be extrapolated to compel release of the computer tape even though it contains identical information.

1. The thrust of the federal and state Freedom of Information Acts is disclosure. Under the state act, a public body such as the university is required to disclose a public record upon request unless the record falls within the scope of enumerated exceptions. A list of students would appear to be a public record, but the nature of the information is within an enumerated exception, being personal, and public disclosure on magnetic tape would constitute a clearly unwarranted invasion of a person's privacy. The public policy implicit in the exemptions can be served only if nondisclosure prevails in situations as specified in the act.

2. Any intrusion into the home, no matter the purpose or extent, is an invasion of privacy. The release of names and addresses, serving as a conduit into the sanctuary of the home, constitutes an invasion of privacy. Under both the federal and state acts, a balancing of the interests of the requester and the subject of the information is required, *i.e.,* the potential harm from an invasion must be weighed against potential benefits to the public from disclosure. The reason for which the information is sought is not a controlling factor. It cannot serve as a catalyst or an impediment to disclosure. Where release of material would be consistent with the articulated legislative intent and the public interest would be sufficiently served, the balance tips in favor of disclosure. However, where the resulting violation of privacy would constitute a clearly unwarranted invasion, disclosure is not justified. Release of the names and addresses of students on computer tape for the plaintiff's pur-

poses would constitute a clearly unwarranted invasion of privacy.

3. A person who seeks information under the act is not required to prove entitlement. Rather the burden is on the public body to justify a denial of a request. The university's decision to publish a student directory did not control the later decision to withhold the information on magnetic tape. The decision to publish the directory is not seen to be a clearly unwarranted invasion of privacy when balanced against the public interest of avoiding chaos in communication among the campus community. Individual students were additionally given the option to exclude their names and addresses from publication in the directory. The reasoning which supports the university's decision to publish the directory, however, cannot be extrapolated to compel release of the computer tape even though it contains identical information. The potential for abuse of the information is great in its computer-ready form as opposed to its printed form and therefore constitutes a more serious invasion of privacy. Additionally, the students who chose to be included in the directory, while charged with the knowledge that the information contained in the directory could be converted to computer form, could not be charged with knowing that the information would be made available outside the directory form for a nominal sum. Those students could not be said to have completely given up their expectation of privacy in the information.

Justice Ryan, joined by Justices Kavanagh and Levin, would hold that the refusal by the university to provide the plaintiff with a copy of a computer-readable magnetic tape used to produce the 1978-1979 Student Directory is not justified under the Freedom of Information Act. The tape is a public record and does not fall within the exemptions from disclosure enumerated in the act. Nor would provision of a copy of the tape amount to a granting of credit by the state in aid of private persons. The plaintiff is entitled to a copy of the tape and reasonable attorney fees, costs, and disbursements.

1. The Freedom of Information Act defines "public record" as a writing prepared, owned, used, in the possession of, or retained by a public body in the performance of an official function from the time it is created. Under the act, a writing includes magnetic tape. The tape in this case qualifies as a writing and was used in the preparation and publication of a student directory, an official function of the university.

2. The statement of public policy in the act provides for free access to public records. All public records must be disclosed

save those falling within an enumerated exception. The test is not whether the person requesting release has a particular need to obtain copies of a writing or that the general public interest will be furthered, but whether the writing is a public record which falls within an enumerated exception. The Court has neither the obligation nor the authority to narrow the scope of the act by judicial fiat.

3. The writing requested in this case is not embarrassing information of a personal nature. It consists of names, addresses, and telephone numbers of students of the university. Merely obtaining such information is not a clearly unwarranted invasion of privacy within the meaning of the privacy exception of the act. A preference by some students that the information not be known by certain persons is not based on the fact that the information is personal, intimate, or embarrassing. A student may prevent the release of the information by filing a notice under the Family Educational Rights and Privacy Act or by requesting exclusion from the directory. Any mail received by a student which the student deems to be offensive may be prevented thereafter by filing the appropriate form with the United States Postal Service. In this case, the public benefits of voter registration and political campaigning contemplated by the plaintiff clearly outweigh any minimum invasion of privacy.

4. No distinction can be made between printed and computer-readable magnetic tape forms of a writing in determining whether information in it must be disclosed. The plain language of the act reveals a legislative intent to treat all governmental writings in the same fashion regardless of form. Any supposed protection of privacy to be gained by denying disclosure in magnetic tape form is illusory. Denial of the information in magnetic tape form would penalize only those groups or persons unable to convert printed information into magnetic tape form. A commercial organization anticipating a return in excess of such cost would not be deterred from converting the information, while political campaigning with the use of the information would be difficult, except perhaps for the particularly affluent.

5. The availability of a public record in one form does not render disclosure in another form exempt. The act provides for disclosure of public records, not public information, and gives a person the right to inspect, copy, or receive copies of a public record, not merely to obtain the information in the record in any form in which a public body sees fit to release it. A paper printout is not "copy" of a computer-readable magnetic tape.

The act also provides that copies of public records shall be made by the most economical means available. In this case it was established that it was both cheaper and faster to copy the tape than to convert the information to a printed list. The fact that the information is more usable in tape form does not make it more intrusive for purposes of the act.

6. The disclosure of public records under the act impartially to the general public for the incremental cost of copying rather than for the original cost of creating the record is not a granting of credit by the state in aid of private persons. For the application of the constitutional proscription against such action, there must be a lending of credit. The general philosophy of the act is that public records belong to the public. Nondisclosure may not be justified on the theory that the information in a public record is proprietary information belonging to a public body.

7. The act provides that a plaintiff who prevails in an action to obtain a copy of a public record which a public body refused to disclose is entitled to attorney fees, costs, and disbursements. It does not matter that the public body's denial was not arbitrary or capricious, that the question involved in the action was one of first impression, or that the defendant sought in good faith to protect the rights of third parties. Where the plaintiff prevails only in part the trial court may award either the entire amount of the reasonable attorney fees, costs, and disbursements incurred or an appropriate amount fairly allocable to the successful part of the plaintiff's case.

97 Mich App 5; 294 NW2d 228 (1980) affirmed by an equally divided Court.

OPINION BY FITZGERALD, C.J.

1. RECORDS — FREEDOM OF INFORMATION ACT — NAMES AND AD-
DRESSES — INVASION OF PRIVACY.

*Names and addresses of students at a public university stored on computer-ready magnetic tape need not be released under the Freedom of Information Act for the purpose of compiling political mailing lists; such a public disclosure would constitute a clearly unwarranted invasion of privacy specifically protected against by the act (MCL 15.243[1][a]; MSA 4.1801[13][1][a]).*

2. RECORDS — FREEDOM OF INFORMATION ACT — INVASION OF PRIVACY
— BALANCING OF INTERESTS.

*A public body, in determining whether to publicly disclose information under the Freedom of Information Act which would invade the privacy of certain persons must weigh the potential*

*harm of the invasion against the potential benefits to be derived by the public; however, where disclosure would otherwise be consistent with the legislative intent of the act and would sufficiently serve the public interest, disclosure is not justified where it would constitute a clearly unwarranted invasion of privacy (MCL 15.243[1][a]; MSA 4.1801[13][1][a]).*

3. RECORDS — FREEDOM OF INFORMATION ACT — INVASION OF PRIVACY — BALANCING OF INTERESTS.

*The reason underlying a request for information under the Freedom of Information Act is not a controlling factor in determining its release, although it may be asserted to define the public interest in the disclosure, and where disclosure would involve an invasion of privacy, the potential harm of the invasion must be balanced with the potential benefits to the public (MCL 15.243[1][a]; MSA 4.1801[13][1][a]).*

4. RECORDS — FREEDOM OF INFORMATION ACT — DISCLOSURE — BURDEN OF PROOF.

*A person seeking to compel disclosure of information in an action brought under the Freedom of Information Act is not required to prove entitlement; the request is reviewed in the circuit court de novo, and the burden is on the public body from which the information is sought to justify a denial of a request (MCL 15.240[1]; MSA 4.1801[10][1]).*

5. RECORDS — FREEDOM OF INFORMATION ACT — NAMES AND ADDRESSES — INVASION OF PRIVACY.

*The release of the names and addresses of students at a public university in the form of a student directory is not necessarily a clearly unwarranted invasion of privacy where the release serves the public interest of easing communications among the campus community and individual students are given the option to be excluded from the directory; however, the reasoning need not be extrapolated to compel release of identical information in the form of computer-ready magnetic tape for the purpose of compiling political mailing lists, and the university would be justified in denying such a request on the ground that the release was a more serious invasion of privacy than the directory release and was exempt under the Freedom of Information Act (MCL 15.243[1][a]; MSA 4.1801[13][1][a]).*

6. RECORDS — NAMES AND ADDRESSES — EXPECTATION OF PRIVACY.

*A student at a public university who does not choose to have his name and address excluded from publication in the university's student directory does not give up his expectation of privacy in*

*the information in excess of the logical uses to which the information may be put so as to impliedly consent to use of the information in an intrusive computer mailing system.*

OPINION BY RYAN, J.

7. RECORDS — FREEDOM OF INFORMATION ACT — DISCLOSURE — WORDS AND PHRASES.

*A public record for purposes of the Freedom of Information Act is a writing prepared, owned, used, in the possession of, or retained by a public body in the performance of an official function from the time it is created; a writing includes a computer-readable magnetic tape (MCL 15.232, subds [c] and [e]; MSA 4.1801[2], subds [c] and [e]).*

8. RECORDS — FREEDOM OF INFORMATION ACT — NAMES AND ADDRESSES — COLLEGES AND UNIVERSITIES.

*A computer-readable magnetic tape of the names, addresses, and telephone numbers of students of a state university used by the university in the preparation and publication of a student directory is a public record subject to disclosure under the Freedom of Information Act (MCL 15.232, subds [c] and [e]; MSA 4.1801[2], subds [c] and [e]).*

9. RECORDS — FREEDOM OF INFORMATION ACT — COLLEGES AND UNIVERSITIES — OFFICIAL FUNCTIONS — STUDENT DIRECTORIES.

*The publication of a student directory by a state university is an official function for purposes of the Freedom of Information Act (MCL 15.232[c]; MSA 4.1801[2][c]).*

10. RECORDS — FREEDOM OF INFORMATION ACT — DISCLOSURE — PUBLIC POLICY — PRESUMPTIONS.

*The public policy underlying the Freedom of Information Act is that all public records must be disclosed unless specifically exempted by the act; the act creates a presumption in favor of release, indicating that in close cases a public body should err on the side of disclosure (MCL 15.231, 15.232[c]; MSA 4.1801[1], 4.1801[2][c]).*

11. RECORDS — FREEDOM OF INFORMATION ACT — DISCLOSURE — EXEMPTIONS.

*A person seeking disclosure of a public record under the Freedom of Information Act need not prove any particular need or right to the information or that the general public interest will be furthered; the test is whether the record requested is a public record and whether it falls within an enumerated exemption to*

*disclosure (MCL 15.231, 15.232[c], 15.243; MSA 4.1801[1], 4.1801[2][c], 4.1801[13]).*

12. RECORDS — FREEDOM OF INFORMATION ACT — DISCLOSURE — FEES FOR DISCLOSURE.

*The Legislature recognized that disclosures of public records under the Freedom of Information Act would benefit public as well as private interests, as reflected in the provision in the act for fees for copying public records and for the waiver or reduction of fees where the disclosure is in the public interest (MCL 15.234[1]; MSA 4.1801[4][1]).*

13. RECORDS — FREEDOM OF INFORMATION ACT — STUDENTS — NAMES AND ADDRESSES — INVASION OF PRIVACY.

*Information in a public record which is of a personal nature and which, if disclosed, would be a clearly unwarranted invasion of a person's privacy may be exempted from disclosure under the Freedom of Information Act, but names, addresses, telephone numbers, and other standard identifying information of students at a state university are not information of a personal nature and do not fall within the privacy exemption (MCL 15.243[1][a]; MSA 4.1801[13][1][a]).*

14. RECORDS — FREEDOM OF INFORMATION ACT — INVASION OF PRIVACY — FORM OF RECORDS.

*No distinction can be made between the printed and computer-readable magnetic tape forms of a public record under the Freedom of Information Act in determining whether disclosure of the record is a clearly unwarranted invasion of privacy; a public body may not exempt from disclosure otherwise public records by converting the record from one form to another (MCL 15.232[e]; MSA 4.1801[2][e]).*

15. RECORDS — FREEDOM OF INFORMATION ACT — DISCLOSURE — COPIES OF RECORDS.

*A person has a right to inspect, copy, or receive copies of a public record under the Freedom of Information Act, not merely to obtain the information in the record in any form in which a public body sees fit to release it; where the record exists in computer-readable, magnetic tape form, a person is entitled to a copy of the tape; a paper printout is not a "copy" of a magnetic tape (MCL 15.232[c], 15.233; MSA 4.1801[2][c], 4.1801[3]).*

16. RECORDS — FREEDOM OF INFORMATION ACT — FEES FOR DISCLOSURE — GRANTING OF CREDIT — CONSTITUTIONAL LAW.

*The disclosure of public records under the Freedom of Information Act impartially to the general public for the incremental*

*cost of copying rather than for the original cost of creating the record is not a granting of credit by the state in aid of private persons and does not justify nondisclosure on the theory that the information is proprietary information belonging to a public body (Const 1963, art 9, § 18; MCL 15.234[1]; MSA 4.1801[4][1]).*

17. Records — Freedom of Information Act — Attorney Fees — Costs.

*A person who prevails in an action asserting the right to inspect or receive a copy of a public record under the Freedom of Information Act is entitled to reasonable attorney fees, costs, and disbursements without regard to whether a public body's denial was arbitrary or capricious, the question involved was one of first impression, or the defendant in good faith sought to protect the rights of third parties, and where a person prevails only in part, the trial court may award either the entire amount of the fees, costs, and disbursements or an appropriate amount fairly allocable to the successful part of the plaintiff's case (MCL 15.240[4]; MSA 4.1801[10][4]).*

*Vande Bunte & Kinkade* (by *Richard W. Kinkade)* for plaintiff.

*Byron H. Higgins* for defendants.

Fitzgerald, C.J. We are asked to determine whether defendants violated the Freedom of Information Act, MCL 15.231 *et seq.;* MSA 4.1801(1) *et seq.,* by denying plaintiff's request for a copy of the magnetic tape used to produce the Michigan State University student directory. We hold that such denial was proper, and therefore affirm the decision of the Court of Appeals.

I

In September, 1978, plaintiff Lawrence Kestenbaum sought from defendants Michigan State Uni-

versity and Dale Arnold, the university's designated freedom of information officer, a duplicate of the computer tape used to produce the directory of students attending the school. Plaintiff contended that he was entitled to the tape under the Freedom of Information Act (hereinafter FOIA). Plaintiff stated that he wanted the tape to facilitate political mailings in connection with the November, 1978, election.

Defendants refused the request, offering instead to give plaintiff either a copy of the directory as soon as it was available, or an immediate printout of the information on the tape. The university asserted that its position was supported by the FOIA, specifically the provision exempting from disclosure information within the scope of the Family Educational Rights and Privacy Act of 1974, 20 USC 1232g.[1]

Plaintiff subsequently filed suit in Ingham Circuit Court. On October 18, 1978, the trial court ordered defendants to create a duplicate magnetic tape for plaintiff's use, deleting all information on the original except names and addresses of students. The trial court further directed that plaintiff make no use of the tape other than for political mailings, and that plaintiff return the tape after the election. Plaintiff was denied attorney fees, costs, disbursements or damages because the trial court concluded that defendants' refusal had not been arbitrary or capricious, and that the case

---

[1] Michigan State University, as a recipient of federal funds, falls within the purview of the Family Educational Rights and Privacy Act (Buckley Amendment; PL 90-247, Title IV, § 438 as amended; 20 USC 1232g, 45 CFR 99.1 *et seq.*). That statute provides for access to student records by eligible students and parents, and also establishes the privacy of those records.

presented a valid question of first impression with substantial effects on the rights of third persons.[2]

Plaintiff appealed the denial of attorney fees and costs. Defendants filed a cross appeal on the issues of whether the students' names and addresses were exempt from disclosure under the Family Educational Rights and Privacy Act, and whether a public body is required under the FOIA to release for a nominal cost items of proprietary interest owned by the public.

The Court of Appeals affirmed the denial of attorney fees and costs, but reversed the trial court's finding that plaintiff was entitled to a tape of the students' names and addresses. *Kestenbaum v Michigan State University,* 97 Mich App 5; 294 NW2d 228 (1980). The Court did not rely upon the Family Educational Rights and Privacy Act, however, but rather upon § 13(1)(a) of FOIA, MCL 15.243(1)(a); MSA 4.1801(13)(1)(a), which protects against a "clearly unwarranted invasion of an individual's privacy". The Court further stated that release of the computer tape would contravene the constitutional prohibition against public funds being used to support a private purpose. Const 1963, art 9, § 18. Plaintiff's application for rehearing was denied.

This Court granted leave to appeal. 411 Mich 869 (1981).

---

[2] Under § 10 of the FOIA, MCL 15.240; MSA 4.1801(10), a person who challenges the denial of information and prevails in court is entitled to reasonable attorney fees, costs and disbursements. If the person prevails only in part, the award of compensation is discretionary with the court. If the court determines that the public body acted arbitrarily and capriciously, the plaintiff receives punitive damages in addition to any actual or compensatory damages.

## II

Freedom of information acts were passed by Congress and the various state legislatures in response to public concern over bureaucratic abuses and secrecy. The federal act[3] preceded its Michigan counterpart by some ten years and served as a model for the state legislation. The thrust of both versions is a policy of disclosure.

Under the state act, a *public body* is required to disclose a *public record* upon request unless the record falls within the scope of certain enumerated exceptions. The terms "public body" and "public record" are defined in the preliminary sections of the FOIA.

There is no question that Michigan State University is a public body, having been "created by state or local authority or which is primarily funded by or through state or local authority". FOIA § 2(b)(iv), MCL 15.232(b)(iv); MSA 4.1801(2)(b)(iv). A list of students appears to be a public record, *i.e.,* "a writing prepared, owned, used, in the possession of, or retained by a public body in the performance of an official function, from the time it is created". FOIA § 2(c). Further, the term "writing" specifically includes a magnetic tape. FOIA § 2(e).

It is important to note at this point that a significant difference between Michigan's FOIA and the federal precursor is that the state act begins with a preamble which sets forth legislative intent:

---

[3] The federal act, PL 89-487, 80 Stat 250 (1966), was codified at 5 USC 552 by PL 90-23, 81 Stat 54 (1967). Major amendments were enacted in 1974 by PL 93-502, §§ 1-3, 88 Stat 1561-1564. The act was amended further by PL 94-409, § 5(b), 90 Stat 1247 (1976); PL 95-454, Title IX, § 906(a)(10), 92 Stat 1225 (1978).

"It is the public policy of this state that all persons are entitled to full and complete *information regarding the affairs of government and the official acts of those who represent them* as public officials and public employees, consistent with this act. The people shall be informed *so that they may fully participate in the democratic process.* MCL 15.231(2); MSA 4.1801(1)(2)." (Emphasis added.)

Thus, each provision of the FOIA must be read so as to be consistent with the purpose announced in the preamble.

Whether a list of students is the kind of information envisioned by the Legislature as appropriate for disclosure is debatable, but such a determination is not necessary to our holding in this case.

By accepting without deciding that the list of students qualifies as a public record, we necessarily turn our focus to the enumerated exemptions. The posture of plaintiff's inquiry then becomes whether Michigan State University, a public body in possession of a public record, to wit, a magnetic tape, was authorized under the FOIA to deny disclosure.

We hold that the university was justified in denying plaintiff's request because the release of the magnetic tape containing the names and addresses of students would run afoul of the exemption set forth in § 13(1)(a)—information of a personal nature where the public disclosure of the information would constitute a clearly unwarranted invasion of an individual's privacy.

In fact, despite the wording of § 13, which seems to make withholding of exempt information discretionary with the public body, the university arguably would not have been justified if it had granted plaintiff's request. It is logically persuasive that the public policy implicit in the exemp-

tions only can be served if nondisclosure prevails in those situations described in § 13.[4]

## III

The concept of privacy is elusive. Social scientists and legal scholars alike have struggled for a definition expansive enough to include important concerns and yet narrow enough to be workable.

Privacy as an existential condition must be distinguished from a legally cognizable right to privacy. The "right to privacy" has been described at various times as stemming from either property or trust theories or as flowing from certain constitutional guarantees or a penumbra thereof. This

---

[4] Section 13 of the FOIA reads in part: "(1) A public body *may* exempt from disclosure as a public record under this act". (Emphasis added.) Total discretion to release information which meets the definition of particular exemptions would lead to peculiar results: a public body would be free to release information which would "interfere with law enforcement proceedings", "deprive a person of the right to a fair trial or impartial administrative adjudication", "endanger the life or physical safety of law enforcement personnel", and violate certain privileges such as that of attorney-client, physician-patient and priest-penitent.

An action brought to enjoin the release of arguably private information is called a "reverse" FOIA suit. Most commentators agree that the drafters of the FOIA legislation probably did not contemplate the problems that such suits would create. One critic described the dilemma facing public bodies which must decide whether to disclose information which arguably could be withheld under the privacy exemption: "Under these circumstances, the government agency occupies a delicate position in the midst of the submitter's and requester's competing interests, requiring Odyssean skills to safely navigate the narrow strait between Scylla and Charybdis." English, *Protecting the Stakeholder: Defense of the Government Agency's Interests During Reverse FOIA Lawsuits,* 31 Adm L Rev 151, 152 (1979). Another critic suggests that a statutory scheme that makes withholding of such information discretionary with the public body yet does not provide for notice to the one whose privacy will be invaded "gives the impression of having been sketched by a surrealistic draftsman". Miller, *Personal Privacy in the Computer Age: The Challenge of a New Technology in an Information-Oriented Society,* 67 Mich L Rev 1089, 1196 (1969).

right, whatever its source, was labeled by Justice
COOLEY as "the right to be let alone".[5]

As society has expanded and distance contracted
because of advances in communication and travel,
the right to privacy for many has become the
ability to choose with whom and under what cir-
cumstances they will communicate.

Obviously, not every interest of every person
rises to a level which the law can or should
protect. However, despite changing attitudes and
changing laws, there has remained throughout
this country's legal history one recognized situs of
individual control—the dwelling place. Without
exception, this bastion of privacy has been afforded
greater protection against outside assaults than
has any other location. The United States Su-
preme Court on many occasions has re-emphasized
the reverence with which the law views the pri-
vate domicile.[6]

These prefatory remarks serve to illustrate that
any intrusion into the home, no matter the pur-
pose or the extent, is definitionally an invasion of
privacy. *A fortiori,* the release of names and ad-

[5] Warren & Brandeis, *The Right to Privacy,* 4 Harv L Rev 193, 195
(1890), quoting from Cooley, Torts (2d ed), p 29.

[6] See, for instance, *Martin v Struthers,* 319 US 141; 63 S Ct 862; 87
L Ed 1313 (1943); *Public Utilities Comm of the Dist of Columbia v
Pollak,* 343 US 451; 72 S Ct 813; 96 L Ed 1068 (1952); *Mapp v Ohio,*
367 US 643; 81 S Ct 1684; 6 L Ed 2d 1081 (1961); *Camara v Municipal
Court of the City & County of San Francisco,* 387 US 523; 87 S Ct
1727; 18 L Ed 2d 930 (1967); *Stanley v Georgia,* 394 US 557; 89 S Ct
1243; 22 L Ed 2d 542 (1969); *Rowan v United States Post Office Dep't,*
397 US 728; 90 S Ct 1484; 25 L Ed 2d 736 (1970). *United States v
Orito,* 413 US 139; 93 S Ct 2674; 37 L Ed 2d 513 (1973); *United States
v Martinez-Fuerte,* 428 US 543; 96 S Ct 3074; 49 L Ed 2d 1116 (1976);
and *FCC v Pacifica Foundation,* 438 US 726; 98 S Ct 3026; 57 L Ed 2d
1073 (1978).

dresses constitutes an invasion of privacy, since it serves as a conduit into the sanctuary of the home.

The United States Supreme Court has refused to endorse the idea that such an intrusion is so minimal as to be inconsequential.

"We therefore categorically reject the argument that a vendor has a right under the Constitution or otherwise to send unwanted material into the home of another. If this prohibition operates to impede the flow of even valid ideas, the answer is that no one has a right to press even 'good' ideas on an unwilling recipient. That we are often 'captives' outside the sanctuary of the home and subject to objectionable speech and other sound does not mean we must be captives everywhere. * * * The asserted right of a mailer, we repeat, stops at the outer boundary of every person's domain." *Rowan v United States Post Office Dep't,* 397 US 728, 738; 90 S Ct 1484; 25 L Ed 2d 736 (1970).

It does not suffice, however, to merely label the release of names and addresses in this case an invasion of privacy. In order to come under exemption (1)(a) of § 13, the information must be of such a nature that "the public disclosure of the information would constitute a clearly unwarranted invasion of an individual's privacy".

The similarity between the FOIA and the federal act invites analogy when deciphering the various sections and attendant judicial interpretations. The exemption in the federal FOIA most similar to exemption (1)(a) of § 13 provides for the withholding of "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy". 5 USC 552(b)(6).

The wording of the federal exemption ostensibly makes it more narrow than the state exemption.

Furthermore, it must be remembered that the overlay of legislative intent articulated in the preamble to the FOIA is not present in the federal act.

The federal act does not require persons seeking information to explain how they will use the material. It generally has been accepted, however, that where the requested information might fall under the federal privacy exemption, a balancing test must be employed, *i.e.,* the public interest in disclosure must be weighed against the potential invasion of privacy.

The United States Supreme Court, in an opinion signed by five justices, has endorsed the balancing approach in the FOIA privacy exemption cases. *Dep't of the Air Force v Rose,* 425 US 352, 372; 96 S Ct 1592; 48 L Ed 2d 11 (1976). "Congress sought to construct an exemption that would require a balancing of the individual's right of privacy against the preservation of the basic purpose of the Freedom of Information Act 'to open agency action to the light of public scrutiny.' " The Court quoted from S Rep No 813, p 9: " 'The phrase "clearly unwarranted invasion of personal privacy" enunciates a policy that will involve a balancing of interests between the protection of an individual's private affairs from unnecessary public scrutiny, and the preservation of the public's right to governmental information.' " *Id.* It is not clear precisely what comprises the public interest to be weighed in any given instance.

Only a few courts have considered specifically whether names and addresses come under the protection of the federal privacy exemption. The usual approach in those cases has been to balance the privacy interest against the public benefit to

be realized from the *particular use* intended by the person seeking the information. See, for example: *Wine Hobby USA, Inc v United States Internal Revenue Service,* 502 F2d 133 (CA 3, 1974), and *Getman v NLRB,* 146 US App DC 209; 450 F2d 670 (1971).

The drafters of the state FOIA similarly did not include language which would compel those seeking information to divulge their reasons for doing so. However, legislators recognized that the release of certain information could constitute a "clearly unwarranted" invasion of privacy and should not be required; thus, it also is necessary under the state act to balance interests.

It is important initially to designate the interests that are to be juxtaposed under § 13(1)(a) of the state act. Each side of the scales is to be measured with respect to the nature of the information requested. If the information is such that its release would be an invasion of privacy, however minimal, balancing is required. This means that potential harm from the invasion must be weighed alongside potential benefits to the public from disclosure.

The reason the information is sought in a specific instance is not a controlling factor. It is permissible to define the public interest in disclosure by referring to the uses contemplated by *some* members of the public, but not by *exclusively* focusing on the intention of the person requesting the information. If release of the material would be consistent with the legislative intent articulated in the preamble of the FOIA, and if the public interest would be sufficiently served, the scales tip in favor of disclosure. The only effective counterbalance would be a determination that, despite the potential benefits of public disclosure, the resulting

privacy violation could not be justified because it would be "clearly unwarranted".[7]

As the First Circuit Court of Appeals noted when reviewing a privacy exemption case under the federal act, "[W]e do not believe that the capability of the individual requester is a proper subject of inquiry * * * any more than his relative degree of need for or interest in the information." *Kurzon v Dep't of Health & Human Services,* 649 F2d 65, 68, fn 2 (CA 1, 1981).

Another reason why a specific purpose cannot serve as a catalyst nor an impediment to disclosure is because there is no mechanism in the FOIA by which use can be restricted once a public body has permitted release. Only those requests which are reviewed *de novo* by the courts[8] become subject to such limitations.[9] Therefore, once it is deter-

[7] Determining the degree of an invasion of privacy should not be a difficult task for courts, since they have demonstrated their abilities to do so in other areas. When the phrase "clearly unwarranted invasion of privacy" is used in tort litigation, "courts have quantified the magnitude of the infringement by deciding whether the matters or information made public would be 'offensive and objectionable to a reasonable man of ordinary sensibilities'. The customs, mores, or ordinary views of the community have been used as references in this determination." (Footnotes omitted.) Hoglund & Kahan, *Invasion of Privacy and the Freedom of Information Act: Getman v NLRB,* 40 Geo Wash L Rev 527, 539 (1972). A similar approach under the FOIA may avoid potential inequities.

[8] Under § 10(1) of the FOIA, a person whose request for information is denied may sue in circuit court to compel disclosure. The court determines the matter *de novo,* with the burden on the public body to sustain its denial.

[9] At least one federal circuit court of appeals has discussed the special dilemma a court faces when reviewing a FOIA case *de novo* and attempting a balancing of interests. "That a balancing is envisioned is plain. What is unclear is whether the balancing is to be performed in the context of unrestricted disclosure to the public or of a use-specified release confined to the requesting parties." *Ditlow v Schultz,* 170 US App DC 352, 357; 517 F2d 166 (1975). Earlier the court had expressed this view in a footnote: Since the privacy exemption "necessarily requires the court to balance a public interest purpose for disclosure of personal information against the potential invasion of individual privacy, a court's decision to grant disclosure * * * carries with it an implicit limitation that the information, once

mined that disclosure of certain information would result in a clearly unwarranted invasion of privacy,[10] a further inquiry into intended use serves no purpose.

In the case at bar, for instance, the trial court held that because plaintiff would use the magnetic tape information in conjunction with an election campaign, the invasion of privacy was justified. Conversely, the Court of Appeals labeled the intended use a commercial one, not sufficient to neutralize the potential harm which would result from an invasion of privacy. Such differences in categorization underscore our point.

Conscious that the basic thrust of the FOIA was to be a policy of disclosure, the Legislature placed upon the public body denying a request the burden of justifying its decision.[11] At no time is one seeking the information required to prove entitlement. As we stated, a particular intended use is irrelevant. The Court of Appeals was incorrect, therefore, in concluding that plaintiff was obliged to show that the public interest in release outweighed the possibility of harm to the people involved. It was up to Michigan State University to prove that the information was exempt from the general rule of disclosure.

We note, parenthetically, that the courts of this

disclosed, be used only by the requesting party and for the public interest purpose upon which the balancing was based." *Getman v NLRB,* 146 US App DC 209, 216, fn 24; 450 F2d 670 (1971).

[10] Note: Even after determining that certain information is exempt from disclosure under the FOIA because its release would constitute a clearly unwarranted invasion of privacy, a public body and reviewing court are required to further ascertain whether the material could be edited so that certain segments still could be available as a public record. FOIA, § 14(1), MCL 15.244(1); MSA 4.1801(14)(1). In the instant case, redaction of the exempt information—names and addresses of students—would render the computer tape useless to plaintiff Kestenbaum.

[11] See fn 8.

state, long before the enactment of the FOIA, recognized that citizens have a general right of free access to, and inspection of, public records. See *Booth Newspapers, Inc v Muskegon Probate Judge,* 15 Mich App 203; 166 NW2d 546 (1968), and the cases cited therein.

## IV

Plaintiff has argued that by making the information available in a printed directory, the university sacrificed any privacy interests that may have existed.

However, we think that the university's decision to publish the directory did not control the later decision to invoke exemption (1)(a) as to the magnetic tape.

Implicit in the university's decision to publish the printed directory was its conclusion that the attendant invasion of privacy was not clearly unwarranted. Such a determination was reasonable.

In September, 1978, the student body numbered approximately 44,000 persons, a population comparable to that of the City of Muskegon. As it had done in past years, the university compiled a student directory to ease communications within the campus community and with those outside. The availability of the directory likely prevented a great deal of havoc as students attempted to contact acquaintances and settle down to college life.

The university therefore was justified in concluding that the invasion of privacy was not clearly unwarranted when balanced against the public interest in avoiding a potentially chaotic situation. It is important to note also that there was a

procedure whereby students could "opt out" of the
directory.[12]

However, the same reasoning which supports
the university's decision to publish the directory
cannot be extrapolated to compel release of the
computer tape, even though it contains identical
information.

It is not seriously debated that the pervasiveness
of computer technology has resulted in an ever-
increasing erosion of personal privacy.[13] There is
available a larger storehouse of information about
each of us than ever before. Computer information
is readily accessible and easily manipulated. Data
available on a single tape can be combined with
data on other tapes in such a way as to create
new, more comprehensive banks of information.

"The central problem is to determine how the
legal system can best insure that a proper balance
is struck between the traditional libertarian ideals
embodied in the concept of privacy and the im-
mense social benefit that computer technology
offers." Miller, *Personal Privacy in the Computer
Age: The Challenge of a New Technology in an
Information-Oriented Society,* 67 Mich L Rev 1089,
1222 (1969).

While it is true that the computer era has

---

[12] Students who desired to withhold their names from the directory
were required to submit a signed, written request at the Administra-
tion Building within the first five days of the fall term classes. The
existence of the directory and students' rights concerning it were
noted in the Schedule of Classes and Student Handbook.

[13] See, for example, O'Brien, *Privacy and the Right of Access:
Purposes and Paradoxes of Information Control,* 30 Adm L Rev 45
(1978); Miller, *Computers, Data Banks and Individual Privacy: An
Overview,* 4 Colum Human Rights L Rev 1 (1972); Miller, *Personal
Privacy in the Computer Age: The Challenge of a New Technology in
an Information-Oriented Society,* 67 Mich L Rev 1089 (1969).

brought untold benefits for society, it also is fraught with potential dangers to our notions of individual autonomy. Vigilance is necessary, lest the right to privacy atrophy due to lack of exercise.

"[T]he computer's potential as an engine of social change—and human control—indicates that a greater threat to freedom may lie in inaction or continued application of ancient or inapposite doctrine in the face of the growing power of information in contemporary life and the increasing concentration of control over it." *Id.*

Form, not just content, affects the nature of information. Seemingly benign data in an intrusive form takes on quite different characteristics than if it were merely printed.

The very existence of information in computer-ready form may serve to motivate an invasion of privacy. "Even if the cost of securing access to computerized information is higher than the cost of dredging out the information in a more traditional form of record, the centralized quality and compactness of a computerized dossier creates an incentive to invade it because the payoff for doing so successfully is much larger." Miller, *Computers, Data Banks and Individual Privacy: An Overview,* 4 Colum Human Rights L Rev 1, 10 (1972).

The university was not wrong in concluding that the release of names and addresses on magnetic tape was a more serious invasion of privacy than disclosure in directory form.

Plaintiff has suggested that students whose names and addresses appeared in the directory no

longer had an expectation of privacy as to that information. That deduction is not inevitable. Certainly those students who did not opt out should have known that the information was available to persons within the university community free of charge and to others who purchased copies of the directory. Such students also should have known that individuals and organizations with sufficient means could reduce the printed information to computer form and compile mailing lists, or undertake the onerous task of individually contacting each of the 44,000 students.

However, it does not follow that students should have known that an efficient and intrusive computer mailing system already was available to anyone for a nominal sum.[14] In deciding whether to appear in or opt out of the directory, students should not have been expected to consider the mechanics by which the university published the information.

Plaintiff also challenged the trial court's denial of attorney fees and costs. That issue is moot, since we hold that plaintiff was not entitled to a copy of the computer tape containing the names and addresses of students.

Affirmed. No costs, a public question being involved.

WILLIAMS and COLEMAN, JJ., concurred with FITZGERALD, C.J.

RYAN, J. This is the first case in which this

---

[14] The director of data processing at Michigan State University testified that the initial cost of developing the computer tape of the student directory was about $3,000. He estimated the incremental cost of producing a copy at only $60, however.

Court has been called upon to interpret the Michigan Freedom of Information Act[1] (FOIA).

The plaintiff, Lawrence Kestenbaum, sought disclosure of a magnetic tape containing the student directory at Michigan State University and documentation for that tape. The defendants, Michigan State University and its designated FOIA officer, Dale Arnold, defended their refusal to release the tape on the grounds that the FOIA does not require disclosure; that disclosure would constitute an unconstitutional granting of credit in aid of private persons; and that even if the refusal violated the FOIA, the university should not be required to pay plaintiff's reasonable attorney fees, costs, and disbursements. We disagree.

We hold that the requested magnetic tape is a "public record"; that the "public policy" section of the FOIA does not justify nondisclosure; that the tape does not fall within the privacy exemption; that disclosure does not constitute an unconstitutional granting of credit; and that the plaintiff may recover reasonable attorney fees, costs, and disbursements. Accordingly, we would reverse the decision of the Court of Appeals.

The material facts are not in dispute. The plaintiff, president of a registered student political organization, requested a copy of the magnetic tape which the defendant Michigan State University used to produce a student directory.[2] The plaintiff intended to use the names and addresses to facilitate voter registration and to conduct other politi-

---

[1] MCL 15.231 *et seq.;* MSA 4.1801(1) *et seq.*

[2] The university did not produce the directory itself; instead, the magnetic tape was sold to a private profit-making corporation, Promotional Enterprises. That company printed at least 22,000 directories free of charge for the university; it covered its costs and made its profit by selling ads or "yellow pages" which are included in the student directory. Then the magnetic tape was either returned to the university or destroyed.

cal mailings in connection with the general election of November, 1978.

The defendant Michigan State University denied the plaintiff's request. It is unclear whether the denial was because of defendant's failure to respond in a timely fashion,[3] or whether the university committee's decision, dated October 6, 1978, constituted a timely denial. In any event, the denial of the request for the magnetic tape was followed by an offer to provide the plaintiff with a printed copy of the student directory as soon as it was received from the printer, or, if the plaintiff were willing to pay the cost, the university would run a computer printout of the contents of the tape. The plaintiff rejected the compromise offer, maintaining that the magnetic tape was a public record and that he was entitled to inspect and copy it.

The plaintiff then filed suit in Ingham Circuit Court. The defendant argued that the magnetic tape was exempt from disclosure because release of the information in that form would violate the Family Educational Rights and Privacy Act.[4] However, it was argued that the printing of the permanent student directory did not violate the FERPA because the students were separately advised both of their general right to require their consent before the university released even "directory" information in any form whatsoever, and of their specific right to opt out of the student directory. In addition, MSU employed at least one person who was present at registration and available to discuss with students whether to consent to be included in the directory. Only 20 to 25 of the approximately 44,000 students enrolled at Michi-

[3] See MCL 15.235, subds (2) and (3); MSA 4.1801(5), subds (2) and (3).
[4] 20 USC 1232g.

gan State University exercised their option to delete their names from the student directory. The defendant also argued that releasing a copy of the magnetic tape would constitute the use of public funds for a private purpose.

On October 10, 1978, a hearing upon an order to show cause was held before Judge Harrison. In light of scheduling problems[5] and the imminence of the November elections, the trial judge suggested that the attorneys cooperate by stipulating to as much as possible. The plaintiff's attorney indicated that in order to expedite the matter he would not object to an order restricting the use of the magnetic tape to political purposes and requiring that the tape be returned to the university upon the completion of the campaign. The plaintiff's attorney also stipulated to the deletion of all information to be published in the student directory (home address, major, year in school, and telephone number), except for the names and local addresses required for plaintiff's political campaign purposes.

On October 18, 1978, the trial court issued an opinion ordering the defendants to create a copy of the magnetic tape for use by the plaintiff. The stipulated restrictions on use and deletions from the tape were included in the final order. The cost of duplication was to be paid by the plaintiff. The court further ordered that no attorney fees, costs, disbursements, or damages be awarded to the plaintiff, since the denial by Michigan State University was not arbitrary or capricious and the matter presented a valid question of first impression with substantial effects on the rights of third persons. The plaintiff's motion to modify or amend

[5] Actions under the FOIA are to be heard at the earliest practicable date and expedited in every way. MCL 15.240(3); MSA 4.1801(10)(3).

the order to include reasonable attorney fees, costs, disbursements, and damages was denied.

The plaintiff appealed the denial of attorney fees, costs, disbursements, and damages to the Court of Appeals. The defendants filed a cross appeal on the issues of whether the students' names and addresses were exempt from disclosure under the Family Educational Rights and Privacy Act, and whether a public body is required under the FOIA to release, for a nominal cost, items of proprietary interest owned by the public.

The Court of Appeals affirmed the denial of attorney fees and costs, but reversed the trial court's ruling that the plaintiff was entitled to a copy of the magnetic tape. The Court did not rely upon the Family Educational Rights and Privacy Act ground asserted in defendants' claim of appeal; instead, the Court decided *sua sponte* that the release of the tape constituted a "clearly unwarranted invasion of an individual's privacy" within the meaning of MCL 15.243(1)(a); MSA 4.1801(13)(1)(a). The Court also found that release of the computer-readable tape would violate the constitutional provision against granting credit in aid of private persons. Mich Const 1963, art 9, § 18. *Kestenbaum v Michigan State University,* 97 Mich App 5; 294 NW2d 228 (1980). The plaintiff's application for rehearing was denied.

This Court granted leave to appeal. 411 Mich 869 (1981). We would reverse.

I

We must determine initially whether the requested magnetic tape is a "public record" within the meaning of the Michigan FOIA. Only a "public record" is subject to the public right to inspect,

copy, or receive copies of documents. MCL
15.233(1); MSA 4.1801(3)(1). If the Court of Appeals
correctly held that the requested tape is not a
"public record", it would be unnecessary to decide
whether the "privacy" exemption, or any exemp-
tion, authorizes nondisclosure. Accordingly, the
statutory definition of "public record" must be
examined.

The term "public record" is defined in MCL
15.232(c); MSA 4.1801(2)(c):

> " 'Public record' means a writing prepared, owned,
> used, in the possession of, or retained by a public body
> in the performance of an official function, from the time
> it is created."

The computer tape that is the subject of this
litigation is a "writing", since MCL 15.232(e); MSA
4.1801(2)(e) defines a writing to include "magnetic
or paper tapes * * * or other means of recording
or retaining meaningful content". The magnetic
tape is undisputably "prepared, owned, used, in
the possession of, or retained by" the defendant
public body. The only remaining question is
whether the computer tape was prepared, owned,
used, possessed or retained "in the performance of
an official function".

The expression "in the performance of an official
function" is not defined in the statute. Accord-
ingly, the term must be construed according to its
commonly accepted and generally understood
meaning. *Production Credit Ass'n of Lansing v
Dep't of Treasury,* 404 Mich 301, 312; 273 NW2d
10 (1978). The need to exclude unofficial writings
belonging to private citizens from the definition of
"public record" is apparent when one recognizes
that a state employee is included within the defini-

tion of a "public body". MCL 15.232(b)(i); MSA 4.1801(2)(b)(i). A public body may not thwart disclosure under the FOIA by the simple expedient of sending sensitive documents home with its employees. However, unofficial private writings belonging solely to an individual should not be subject to public disclosure merely because that individual is a state employee.[6]

We have no difficulty in concluding that the magnetic tape involved in this case was prepared, owned, used, possessed, and retained by the defendant public body "in the performance of an official function". As the circuit judge aptly noted in his opinion, "Indeed, it would be useless to argue [that] such an institution could function without such a list of students". The specific magnetic tape sought in this litigation was used in the preparation and publication of a student directory, a publication our brother describes as compiled "to ease communications within the campus community" and likely to prevent "a great deal of havoc". Facilitating communications among students, preventing a great deal of havoc, and simply operating the university in an efficient manner are all "official functions" of Michigan State University. Since the requested "writing" was prepared, owned, used, possessed, or retained by Michigan State University in the performance of these official functions, we hold that the magnetic tape is a "public record".

---

[6] The question whether a writing is a "public document" or a private one not involved "in the performance of an official function" is separate and distinct from the question whether the document falls within the so-called "privacy exemption" of MCL 15.243(1)(a); MSA 4.1801(13)(1)(a). Many writings prepared, owned, used, possessed, or retained by government in the performance of its functions may contain intimate and embarrassing facts of a personal nature. This does not prevent them from being classified as "public documents". Nondisclosure of such "public documents" must be justified, if at all, under the enumerated exemptions of the FOIA.

## II

The "public policy" section of the FOIA[7] does not provide a separate or independent basis for denying disclosure. The first section of the act provides that:

"(1) This act shall be known and may be cited as the 'freedom of information act'.

"(2) It is the public policy of this state that all persons are entitled to full and complete information regarding the affairs of government and the official acts of those who represent them as public officials and public employees, consistent with this act. The people shall be informed so that they may fully participate in the democratic process."

The Court of Appeals apparently concluded that this section creates a special exemption to disclosure of "public documents".[8] We do not agree.

A policy section, like a preamble, may be used to clarify ambiguous portions of a statute but may not be used to create an ambiguity. 1A Sands, Sutherland Statutory Construction (4th ed), § 20.12, p 63. Here, the statute clearly provides that *all* "public records" must be disclosed unless they are exempt from disclosure under § 13.[9] As stated in MCL 15.232(c); MSA 14.1801(2)(c):

"This act separates public records into 2 classes: (i) those which are exempt from disclosure under section

---

[7] MCL 15.231; MSA 4.1801(1).

[8] "The list of names requested by plaintiff is not related to the affairs of government in such a way as to constitute a basis for official decisions on the part of the university. The release of these names and addresses and the other information contained in the student directory does not assist the general public in such a way as to permit them to fully participate in the affairs of government." *Kestenbaum v Michigan State University*, 97 Mich App 20-21.

[9] MCL 15.243; MSA 4.1801(13).

13, and (ii) all others, which shall be subject to disclosure under this act."

This strict statutory dichotomy belies the assertion that the public record sought in each individual request must inform the general public about the affairs of government. Instead of requiring a judicial declaration in every individual case that disclosure serves the interests of the "general public", the Legislature adopted a per se rule requiring the release of *all* public records, save those falling within an enumerated exception. Such a rule necessarily requires the release of many public records that do not particularly advance the interests of the general public. Unless the release offends one of the § 13 exemptions, however, no reason exists *not* to disclose such documents.

The Legislature recognized that some FOIA disclosures would benefit only private individuals, while other disclosures would primarily benefit the general public. MCL 15.234(1); MSA 4.1801(4)(1):

"Copies of public records may be furnished without charge or at a reduced charge if the public body determines that a waiver or reduction of the fee is in the public interest because furnishing copies of the public record can be considered as primarily benefiting the general public."

If the preamble required that every FOIA disclosure affirmatively benefit the general public, *all* FOIA disclosures would qualify for a waiver or reduction of the copying fee. But the Legislature obviously contemplated that many, if not most, FOIA requests would serve "private" or "commercial" interests, since it carefully set forth the method of calculating the ordinary copying charge. MCL 15.234; MSA 4.1801(4).

The presumption in favor of release is clear. The requesting person need not prove any particular need or right to the information, or that the general public interest will be furthered. The test is whether the writing is a "public record" and whether it falls within an enumerated exemption. The policy of the act is furthered by this test in that (1) administrative and judicial time is not wasted in applying a subjective standard like "furthering the general public interest",[10] and (2) the risk of erroneous nondisclosure is eliminated except in those cases involving the § 13 exemptions. Contrary to the assertion of the Court of Appeals,[11]

_____

[10] Even if the statute did require a finding that the general public interest be served before a public record could be disclosed, we would require disclosure under the facts of this case. The right of citizens to "be informed so that they may fully participate in the democratic process" is of little value if the government requires each person to seek out the information for himself. Many citizens depend on mailings from political candidates and groups to be fully informed. The theoretical availability of alternate forms of political communication, some or all of which may be costly or ineffective when compared to a selective mail campaign, does not deny the fact that the flow of information to the people is *increased* by the voter registration and political activities of the plaintiff.

In addition, it is not at all clear that the only public benefit to be derived from the FOIA relates directly to "open government". As noted by Anthony T. Kronman in *The Privacy Exemption to the Freedom of Information Act,* 9 J Legal Studies 727, 744 (1980), one aim of the federal FOIA is:

"to facilitate the exploitation of positive externalities created by the government's acquisition of valuable information. Although the bureau's list was compiled for a specific governmental purpose, it could also be used productively in other ways (including those contemplated by the plaintiff). If the plaintiff's use of the information were costless —if disclosure would not invade anyone's privacy or impair the government's ability to gather similar information in the future—the wealth of society could be increased by compelling the bureau to reveal its list of names and addresses." See, also, pp 737-738.

[11] "It is evident there is a tendency to interpret the FOIA as a freedom of public records act. When a statute is so broad that it makes all information available to anyone for any purpose, the court has an obligation to narrow its scope by judicial interpretation." *Kestenbaum, supra,* 97 Mich App 23.

Of course, the plaintiff does not assert that the Michigan FOIA makes all information available to anyone for any purpose. The

the FOIA *does* provide for free access to public records. The Court does not have an obligation, nor indeed the authority, to narrow by judicial fiat a statute written too broadly to suit its preference; rather the Court has an obligation to enforce the statute as written.

We hold that the "public policy" statement of the FOIA does not provide a rationale for denying disclosure of "public records". If anything, the policy statement indicates that in close cases, the public body should err on the side of disclosure. The policy statement therefore supports rather than undermines the plaintiff's request in this case.

## III

We must now determine whether the requested public record falls within the privacy exemption of § 13.[12] MCL 15.243(1)(a); MSA 4.1801(13)(1)(a):

"(1) A public body may exempt from disclosure as a public record under this act:

"(a) Information of a personal nature where the public disclosure of the information would constitute a clearly unwarranted invasion of an individual's privacy."

## A

Our initial inquiry is whether the requested

plaintiff simply insists that any exception to the general rule of disclosure must be grounded in a statutory exemption rather than a judicial "interpretation" that, in the opinion of the court, release would not affirmatively advance the interests of the general public.

[12] The only other enumerated exception suggested by the defendant is MCL 15.243(1)(e); MSA 4.1801(13)(1)(e), "[i]nformation the release of which would prevent the public body from complying with 20 U.S.C. section 1232g". We agree with the analysis of both lower courts, which held that release of the requested information in magnetic tape form would not violate the federal statute or its regulations.

information[13] is "of a personal nature". Although the Michigan FOIA was patterned after the federal FOIA, the requirement that the information be of a "personal nature" is unique to the state act.[14]

We can find no judicial support for the proposition that names and addresses are "personal" information.[15] Our brother cites the case of *Rowan v United States Post Office Dep't,* 397 US 728; 90 S Ct 1484; 25 L Ed 2d 736 (1970), for the proposition that the release of names and addresses is per se an invasion of one's personal privacy. In *Rowan,* a unanimous Supreme Court held that a federal statute[16] allowing persons to have their names deleted from an advertiser's mailing lists and pro-

---

[13] In this section, we analyze whether the disclosure of the requested information falls within the privacy exemption without regard to the form in which the information is contained. In part IV, we specifically consider whether the fact that the requested writing is in magnetic tape form is sufficient to bring the document within the privacy exemption.

[14] Compare 5 USC 552(b)(6):

"(b) This section does not apply to matters that are—

* * *

"(6) personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy."

[15] Even the most innocuous fact about a person is potentially embarrassing. See Kronman, *supra,* p 752, and *Ditlow v Schultz,* 170 US App DC 352, 355-356, fn 12; 517 F2d 166 (1975), regarding the names, addresses, and flight numbers of certain airline passengers:

"One can speculate instances in which disclosure of such information might prove embarrassing—*e.g.,* to a traveler who for personal or commercial reasons has put forward a different account of his activities. There may likewise be occasions where a telecast of the crowd at a baseball game may show and embarrass the employee who sought and obtained time off for his grandmother's funeral."

If any information that *might* in the abstract prove embarrassing to *some* people could not be released, our state FOIA would never allow the release of any information about any identifiable person. We interpret "personal" information to mean the kinds of intimate or embarrassing details that most persons prefer to disclose infrequently and selectively, if at all.

[16] 39 USC 4009, now 39 USC 3008.

hibiting future mailings to that person did not violate the sender's First Amendment right to communicate. Nothing in *Rowan* suggests that the mere act of obtaining an individual's name and address constitutes an invasion of privacy, or that mailing one piece of mail to an individual constitutes an invasion of privacy. If the individual finds the mailing objectionable and fills out the appropriate postal form, then and only then is the sender's right to communicate extinguished. The *Rowan* Court emphasized that only an "unwilling" or "unreceptive" recipient could foreclose the receipt of "unwanted" material through the mail.

In interpreting 39 USC 4009, the *Rowan* Court struck a delicate balance between the right to send and the right not to receive mail. While purporting to follow *Rowan,* our colleague's opinion strikes a far different balance, one greatly restricting the asserted First Amendment right to communicate. Instead of giving the sender the opportunity to make at least one initial mailing, with additional mailings prohibited to those persons finding the first mailing objectionable, our brother *presumes* that every person will find the first mailing an objectionable "invasion of privacy, * * * a conduit into the sanctuary of the home", and therefore effectively forbids even the first mailing. This presumption is as paternalistic as it is erroneous. The *Rowan* decision actually supports the release of the names and addresses and the contemplated political mailing in this case, since it provides the mechanism by which individuals may choose whether to receive mailings from the plaintiff. The individual recipients should decide whether they find the plaintiff's political mailings objectionable; this Court should not make that decision for them.

We are satisfied that names, addresses, tele-
phone numbers, and other standard identifying
information simply are not embarrassing informa-
tion "of a personal nature" for the overwhelming
majority of students at Michigan State Universi-
ty.[17] Most citizens voluntarily divulge their names
and addresses on such a widespread basis that any
alleged privacy interest in the information is ei-
ther absent or waived. People applying for employ-
ment reveal their names and addresses on their
resumes; cashing a check or using a credit card
requires the release of one's address; and ordering
magazines or otherwise communicating through
the mail reveals one's address. Being a licensed
driver, a car owner, a property owner or taxpayer,
an officer of a corporation, an applicant for a
marriage license, or a registered voter requires
revelation, at a minimum, of one's name and
address, information which is often routinely made
available to the public.[18] While some people might

[17] At most, 25 out of approximately 44,000 students exercised their
option to delete their names, addresses, telephone numbers, and other
such information from the published student directory. The 25 or so
students who chose to "opt out" are not listed on the computer tape
sought by the plaintiffs; it seems fairly safe to conclude that the
remaining 43,975 students do not consider their names, addresses,
and telephone numbers to be embarrassing personal information, the
disclosure of which would constitute a "clearly unwarranted invasion
of * * * privacy."

[18] For availability of driver's license information, including record
of traffic offenses and the duty to notify of address changes, see MCL
257.204a; MSA 9.1904(1), MCL 257.208; MSA 9.1908, MCL 257.315;
MSA 9.2015, MCL 257.316; MSA 9.2016. For availability of vehicle
registration lists, see MCL 257.232; MSA 9.1932, authorizing the
Secretary of State to sell the lists to any person for a reasonable
price. Names and addresses involved in the conveyance of real prop-
erty are open to public inspection in the office of the register of deeds.
MCL 565.25; MSA 26.543, MCL 565.551; MSA 26.791. Property tax
assessment rolls and indexes may be inspected. MCL 211.10a; MSA
7.10(1), MCL 211.25a; MSA 7.25(1). Information on corporate officers
and directors is available through the Corporations and Securities
Bureau. MCL 450.1131; MSA 21.200(131). Names, addresses, ages, and
other information required by the director of public health in making
application for a marriage license are matters of record. MCL

*prefer* that their names and addresses not be
known to certain individuals such as advertisers,
bill collectors, or freeloading relatives, that prefer-
ence is simply not based on the fact that one's
address is a "personal", intimate, or embarrassing
piece of information. We leave for another day the
question whether, in certain unusual circum-
stances, ordinarily impersonal information might
take on an intensely personal character. *Cf.
United States Dep't of State v Washington Post
Co,* — US —, —; 102 S Ct 1957; 72 L Ed 2d 358,
362, fn 2 (1982).

None of the decisions interpreting the federal
FOIA[19] suggest that the release of names and
addresses, without more, constitutes an invasion of
privacy. In one of the earliest "address list" cases,
*Getman v NLRB,* 146 US App DC 209, 213-214;
450 F2d 670 (1971), the court upheld a federal
FOIA request by two labor law professors for a list
of names, addresses, and telephone numbers of
employees eligible to vote in certain labor elec-
tions. The professors were studying the effect of
campaign tactics utilized by employers and unions.
In order to conduct a valid empirical study, the
researchers wished to conduct personal interviews
both before and after the election. Accordingly,
eligible voters would be telephoned in order to

---

551.102; MSA 25.32. The rolls of registered voters and the elections in
which they have voted are available for inspection and copying. MCL
168.516; MSA 6.1516, MCL 168.522; MSA 6.1522.

It is hard to take seriously the assertion that the advent of the
modern computer era poses a significant threat to the secrecy of one's
name and address. In the days of our forefathers, one's name and
address were a matter of general public knowledge. An individual's
home may still be a "castle" into which "not even the king may
enter", *Rowan, supra,* p 737; but nothing prevents the king or anyone
else from telling others whose castle it is, particularly when the
castle-dweller himself has voluntarily released that information to the
general public.

[19] 5 USC 552 *et seq.*

solicit their consent to a personal interview. The court characterized any invasion of privacy involved in "losing their anonymity" and being solicited over the telephone as "relatively minor".

"[T]he real thrust of Exemption (6) is to guard against unnecessary disclosure of files * * * which would contain 'intimate details' of a 'highly personal' nature. The giving of names and addresses is a very much lower degree of disclosure; in themselves a bare name and address give no information about an individual which is embarrassing." 146 US App DC 214. (Footnotes omitted.)

The only cases in which the federal FOIA has been held not to require the release of names and addresses has been when the disclosure would have revealed *additional* embarrassing information about an individual.[20] Thus, in *Harbolt v Dep't of State,* 616 F2d 772, 774 (CA 5, 1980), the court denied a request for a list of the names and United States addresses of the United States citizens imprisoned in foreign countries on narcotics offenses. The court remarked that "[n]othing could be more personal than an individual's name and home address, *when linked with the stigma of incarceration abroad".* (Emphasis added.) Similarly, in *Wine Hobby USA, Inc v United States Internal Revenue Service,* 502 F2d 133 (CA 3, 1974), the release of a list of heads of households registering as making up to 200 gallons of wine per year for personal use was denied not because the release of *any* list of names and addresses

---

[20] Or, as in *Baldrige v Shapiro,* 455 US 345; 102 S Ct 1103; 71 L Ed 2d 199 (1982), the requested names and addresses are within a different FOIA exemption. In *Baldrige,* names and addresses collected during the census were held to be "specifically exempted from disclosure by statute", namely the Census Act, within the meaning of exemption three.

invades the privacy of the persons on the list, but because release of the list would reveal certain potentially embarrassing facts. The court noted that release of the list would reveal (1) that the registering individual was not living alone, (2) that the registering individual was the head of the household, and (3) that winemaking activity was taking place within the home. It is easy to speculate about the embarrassing effect of it being revealed, for example, that the president of the local Women's Christian Temperance Union makes 200 gallons of wine per year in her basement.[21]

The release of biographical data, without more, has been held not to be barred by the privacy exemption of the federal FOIA. In *Simpson v Vance,* 208 US App DC 270; 648 F2d 10 (1980), the court found no clearly unwarranted invasion of privacy in the release of names, addresses, educational background, employment experience, and other biographical information about employees of the United States State Department.[22] Of course, release of the list sought in this case would reveal that the named persons were enrolled at Michigan State University, but such information is also not personal, intimate, or embarrassing, especially as to those students electing to have their names published in the student directory.

[21] Kronman, *supra,* p 747. Even so, *Wine Hobby* may well have been wrongly decided. See Kronman, *supra,* pp 741-748, especially p 742: "The decision in the *Wine Hobby* case may be criticized on two related grounds: first, that the court unduly discounted the positive benefits of revealing the information sought by the plaintiff and, second, that it exaggerated the negative consequences of disclosure".

[22] While *Simpson* was criticized in *United States Dep't of State v Washington Post Co,* — US —; 102 S Ct 1957; 72 L Ed 2d 358 (1982), that criticism was based on the lower court's narrow interpretation of "similar files" rather than its ultimate conclusion that the privacy exemption did not authorize withholding the biographical data. The "similar files" language at issue in *Washington Post Co* was deleted from the Michigan FOIA; unlike the federal FOIA, Michigan's privacy exemption is explicitly limited to "personal" information.

Another federal case closely on point is *Disabled Officers Ass'n v Rumsfeld,* 428 F Supp 454 (D DC, 1977). In that case, an unincorporated nonprofit association of officers retired with or for a service-connected disability sought a list of names and addresses of all such disabled officers. The association engages in a number of political activities, including lobbying and testifying before Congressional committees on legislation affecting the interests of retired military personnel. Like the instant plaintiff, the association intended to solicit support for its organization and its political goals by mailing information to the individuals on the list. The court concluded that, as in *Getman, supra,* the release of names and addresses did not reveal any personal or embarrassing information, and that any invasion of privacy was minimal.

In *Ditlow v Schultz,* 170 US App DC 352, 355-356; 517 F2d 166 (1975), the plaintiff sought the names and addresses of all individuals taking trans-Pacific airline flights during a certain time period. The plaintiff intended to use the information to assemble a list of members for his antitrust class action against the airlines. Unfortunately for the plaintiff, his antitrust suit had already been dismissed on the merits, with an appeal pending in the federal circuit court of appeals. The District of Columbia Circuit therefore deferred ruling on the plaintiff's FOIA lawsuit until such time as it became clear that the antitrust lawsuit was reinstated and it was necessary to compile a list of class members. The *Ditlow* court did grant the plaintiff the requested relief by enjoining the defendant from destroying the requested data, noting that it was "doubtful" that the information would reveal "intimate or highly personal details" *(id.,* fn 12), and noting that, as in *Getman, supra,* "disclo-

sure would result in less than a substantial invasion of privacy".

Other cases have presented much more compelling reasons for denying the release of certain names and addresses, yet the federal courts have steadfastly implemented the FOIA policy in favor of disclosure. In *Robles v Environmental Protection Agency,* 484 F2d 843 (CA 4, 1973), the plaintiff sought the names and addresses and radiation levels of some 15,000 homes built with radioactive uranium tailings in and around Grand Junction, Colorado. The homeowners were told that the results of the survey would be confidential. The court held that the privacy exemption did not prevent disclosure, and the information was released. In *Kurzon v Dep't of Health & Human Services,* 649 F2d 65 (CA 1, 1981), the court ordered the release of the names and addresses of unsuccessful applicants for research grants from the National Cancer Institute. Despite the damage that might be done to the unsuccessful applicants' professional reputations, the court found that the case did not fall within the privacy exemption and ordered disclosure.

Consistent with federal authority, we hold that names and addresses of students enrolled at Michigan State University are not "information of a personal nature" within the meaning of MCL 15.243(1)(a); MSA 4.1801(13)(1)(a).

## B

Assuming *arguendo* that the requested names and addresses are "personal" and that disclosure would create an invasion of privacy, the question then becomes whether disclosure would constitute a "clearly unwarranted invasion of an individual's privacy". In *Dep't of the Air Force v Rose,* 425 US

352; 96 S Ct 1592; 48 L Ed 2d 11 (1976), the United States Supreme Court adopted a "balancing test" under which the public interest in disclosure is to be weighed against the individual's right to privacy. The majority concluded that disclosure of discipline case summaries of honor code violations at the Air Force Academy did not necessarily constitute a "clearly unwarranted" invasion of privacy, as long as names and other identifying information were deleted. The court acknowledged that some officers' identities *might* be known and revealed by fellow cadets who remembered the incident leading to a discipline hearing and that such identification "could expose the formerly accused men to lifelong embarrassment, perhaps disgrace, as well as practical disabilities, such as loss of employment or friends". *Id.,* p 377. But the Court reasoned that the privacy exemption "was directed at threats to privacy interests more palpable than mere possibilities". *Id.,* p 380, fn 19. Further, upon remand and *in camera* inspection, the trial court was free to withhold any case . summary if deletion of all identifying information was insufficient to safeguard privacy. *Id.,* p 381.

Unfortunately, the Supreme Court failed to specify whether the "balancing" is to be done in light of a hypothetical, unrestricted public disclosure or the specific disclosure and use contemplated by the requesting party. See *Ditlow, supra,* 170 US App DC 357; *Getman, supra,* 146 US App DC 216, fn 24; *Disabled Officers Ass'n, supra,* 428 F Supp 457. Perhaps in *Rose* it was unnecessary to decide that issue, since the specific use contemplated was unrestricted public disclosure in a law review article. In principle, most courts would find that unrestricted public disclosure is required by the fact that "any person" or "a person" may obtain re-

cords under the federal FOIA.[23] In practice, however, the merits of the specific contemplated use appear to determine whether or not the court will order disclosure.[24]

Our brother notes this dilemma and would hold that "[i]t is permissible to define the public interest in disclosure by referring to the uses contemplated by *some* members of the public, but not by *exclusively* focusing on the intention of the person requesting the information" (emphasis in original), and that "a specific purpose cannot serve as a catalyst nor an impediment to disclosure". If the lower courts find it difficult to agree as to whether a specific public benefit is outweighed by a specific invasion of privacy, how can they possibly balance hypothetical public benefits against hypothetical invasions of privacy? The ease with which such a vague hypothetical balancing test can be manipulated is obvious. By failing to mention beneficial uses to which *some* members of the public might put the information,[25] and emphasizing the dan-

---

[23] The former federal statute only authorized release to "persons properly and directly concerned". See Kronman, *supra,* p 743, especially fn 60, for the argument that the requester's motive is irrelevant and may neither contract or expand his FOIA rights. However, the privacy exemption, exemption six, may be an exception to the general rule. See *Getman, supra,* 146 US App DC 216, fn 24.

[24] See *Wine Hobby, supra,* 502 F2d 137: "[T]he sole purpose for which [plaintiff] * * * seeks the information is for private commercial exploitation. Wine Hobby advanced no direct or indirect public interest purpose in disclosure of these lists and indeed, we can conceive of none." Suppose the Washington Post sought the same list to further its investigation of fraud in the administration of the wine permit program? See *Getman, supra,* 146 US App DC 215: "This particular study has been reviewed and supported by virtually every major scholar in the labor law field." Suppose instead a business association sought the same list to conduct its new anti-union campaign? *Cf. Committee on Masonic Homes v NLRB,* 556 F2d 214 (CA 3, 1977). Suppose the plaintiffs in *Rose, supra,* had been members of a communist party seeking to spread dissension in the ranks of the United States armed forces? See also *Harbolt, supra,* 616 F2d 775: "We can attach very little weight in terms of the balancing test described to any work a federal prisoner might accomplish for the detainees."

[25] *E.g., some* distinguished professors might use the list to study the

gers of a "computerized dossier" that *some* members of the public might create,[26] our brother's conclusion is foreordained. While limiting the uses to which the information is put and the persons to which it is disclosed is not always easy or practical,[27] such a procedure should be followed when the alternative is total nondisclosure. The overriding purpose of the FOIA is to require the fullest possible disclosure; when a clearly unwarranted invasion of privacy would result from unrestricted disclosure, but not from a disclosure limited to certain persons for specific purposes, the privacy exemption cannot justify the blanket nondisclosure approved by my colleague.

We think the public benefits of voter registration and political campaigning contemplated in this case clearly outweigh any minimal invasion of privacy. The fundamental importance of voter registration and political communication in a democ-

---

quality of education at the university, or some newspaper might attempt to discover fraud in the number of students actually enrolled for purposes of calculating state aid, or some law review editors might study the minority admissions policy and its effect on the composition of the student body. Countless other possibilities exist.

[26] Every bit of information released under the FOIA has the potential for misuse or abuse. At some point, such misuse is an independent supervening cause, *e.g.,* when a name, address, and phone number listed in the student directory is used for obscene or threatening phone calls, MCL 750.540e; MSA 28.808(5), or extortion, MCL 750.213; MSA 28.410, the criminal act rather than the disclosure of information constitutes the invasion of privacy.

[27] In this case, we note that the circuit judge restricted disclosure to the plaintiff solely for campaign purposes, with the tapes to be returned at the end of the campaign. The restriction was enforced by the court's contempt powers, and nothing in the record indicates that the restriction was disobeyed. Similarly, when the defendant Michigan State University sold the requested magnetic tape to Promotional Enterprises, a private profit corporation, the tape was returned or destroyed after the specific contemplated use was completed. Thus, in the usual "limited disclosure" case, either contractual or judicial restrictions appear adequate to enforce any necessary restrictions on disclosure. If the restrictions are unenforceable under the facts of a particular case, then and only then must the choice be made between total disclosure and total nondisclosure.

racy cannot be overestimated. However, as in *Disabled Officers Ass'n, supra,* which did *not* involve an "opt out" option, we do not find it necessary to impose any restrictions limiting disclosure to political purposes. One can agree that "[e]veryman's mail today is made up overwhelmingly of material he did not seek from persons he does not know"[28] without finding that such "junk mail" constitutes an intolerable or actionable invasion of privacy. In dismissing a suit to enjoin the State of New York from selling the names and addresses of persons registering automobiles, the federal court aptly noted that:

"The short, though regular, journey from mail box to trash can * * * is an acceptable burden, at least as far as the Constitution is concerned." *Lamont v Comm'r of Motor Vehicles,* 269 F Supp 880, 883 (SD NY, 1967).

Students at Michigan State University may prevent the release of their names and the consequent receipt of unsolicited "junk mail" by (1) filing notice under the federal Family Educational Rights and Privacy Act that "directory information" is not to be released absent prior consent, or (2) responding to the specific "opt out" opportunity to be excluded from the student directory. Once a piece of "offensive" junk mail is received, further mailings from that sender may be prevented by (3) filing the appropriate form with the post office under 39 USC 3008. The persons listed on the requested tape have not one but three opportunities to avoid undertaking the journey from mail box to trash can; that is more than sufficient to protect their right of privacy. The stated purpose of *Rowan, supra,* 397 US 736, was to "make the

[28] *Rowan, supra,* 397 US 736. ·

householder the exclusive and final judge of what
will cross his threshold". Instead, this Court would
impose its judgment as to the offensiveness of junk
mail on those householders who have failed to
exercise not one but three options to avoid such
mail. That policy is both unwise and inconsistent
with the provisions of the FOIA.

We therefore hold that unrestricted public dis-
closure of the requested information does not con-
stitute a "clearly unwarranted invasion of an indi-
vidual's privacy" within the meaning of the pri-
vacy exemption.

## IV

Our brother appears to agree that the disclosure
of the requested names and addresses in *printed*
form does not constitute a clearly unwarranted
invasion of privacy. However, he asserts that dis-
closure in *magnetic tape* form does constitute a
clearly unwarranted invasion of privacy.[29]

---

[29] My brother fails to cite a single decision, state or federal, for the
proposition that the requested document should be withheld simply
because it is stored in magnetic tape form. Until today, that claim has
been uniformly rejected. *Ortiz v Jaramillo,* 82 NM 445, 447; 483 P2d
500 (1971), ("We fail to understand how it can be said the inspection
and copying of information contained on a printed and written
affidavit of registration, which is a public record, is proper, but the
inspection and copying of this identical information from the 'working
master record' tape, which is also a public record, constitutes an
invasion of the privacy of the individual named in and identified by
this information. Nothing * * * cited by respondent, supports any
claim that the information contained in a written public record
becomes confidential, or cloaked with a protection of privacy, upon
being converted into a reproducible form on a magnetic tape, which is
also a public record."); *Martin v Ellisor,* 266 SC 377, 379; 223 SE2d
415 (1976) (Required release of magnetic tape containing names and
addresses of all registered voters despite defendant's willingness "to
provide the identical information in the form of a computer printout
or microfiche."); *Menge v City of Manchester,* 113 NH 533; 311 A2d
116 (1973) (Plaintiff held entitled to computerized tape indicating
ownership, description, and value of all real property within the city;
the fact that the cost of copying the tape was $40 while the cost of
converting the written information onto tape was $12,500 is a "com-

We cannot accept the conclusion that the Legislature intended to allow a public body to exempt otherwise public records from disclosure by the simple expedient of converting the public record from one form to another. Surely such a result would exalt form over substance. The plain language of the statute reveals a legislative intent to treat all governmental "writings" in the same fashion regardless of form. MCL 15.232(e); MSA 4.1801(2)(e):

" 'Writing' means handwriting, typewriting, printing, photostating, photographing, photocopying, and every other means of recording, and includes letters, words, pictures, sounds, or symbols, or combinations thereof, and papers, maps, *magnetic* or paper *tapes,* photographic films or prints, microfilm, microfiche, magnetic or punched cards, discs, drums, or other means of recording or retaining meaningful content." (Emphasis added.)

The supposed protection of students' privacy gained by denying disclosure in magnetic tape form is both unfair and illusory. The denial is unfair because it penalizes only those groups or individuals unable to afford the cost of converting the printed information into magnetic tape form.[30] This cost barrier is illusory in that any commer-

mon sense argument in favor" of requiring release in magnetic tape form). See *Minnesota Medical Ass'n v State,* 274 NW2d 84 (Minn, 1978), (Information stored on computer tapes is still a "public record"; the court rejected the assertion that only microfilm of the original invoices was required to be disclosed, reasoning that the law "places no restrictions on the form in which the records shall be made available" nor does it "proscribe furnishing the records in some other form *acceptable to the requester."* [Emphasis added.]). See also Ky Op Atty Gen 77-480 (1977); 630 Op Md Atty Gen (1978); *Lorain County Title Co v Essex,* 53 Ohio App 2d 274; 373 NE2d 1261 (1976) (microfilm).

[30] Defendant's witness testified that the original work cost a little less than $3,000, while the fair market value of the tape might be $4,000.

cial organization anticipating a return from its solicitation in excess of the cost of creating the tape will have no deterrent whatsoever to putting the information in a computer-readable format. In fact, the actual number of unsolicited mailings to the student body might well increase, since the company has every incentive to recoup its initial investment by selling or renting the tape to as many groups or organizations as possible. The result would be that commercial solicitations of the student body would be feasible while political campaigns would be difficult, except perhaps for the particularly affluent.

The appellee argues that since the *information* is made available in printed form, the purposes of the Freedom of Information Act have been satisfied. But nowhere in § 13 can there be found an exemption for "information" already available to the public. Instead, we find in MCL 15.232(c); MSA 14.1801(2)(c), that "public *records*", not public *information,* must be disclosed unless exempt. Similarly, MCL 15.233; MSA 4.1801(3) gives a person the right to "inspect, copy, or receive copies of a *public record*", not merely to obtain the "information" contained in a public record in any form in which the public body sees fit to release it. A paper printout is simply not a "copy" of a magnetic tape. Furthermore, the act directs that "A public body shall utilize the most economical means available for providing copies of public records". MCL 15.234(3); MSA 4.1801(4)(3). The undisputed testimony revealed that it was both cheaper and faster to copy the magnetic tape than to create a printed list of some 44,000 names and addresses.[31] The defendant Michigan State Univer-

---

[31] We do not mean to foreclose the argument in some future case that the public body must make public documents available if requested in a more expensive but more usable format as long as the

sity violated this clear statutory directive by attempting to utilize the less economical means of creating printed material from the magnetic tape.

Our brother holds that nondisclosure of the magnetic tape is justified because it converts "seemingly benign data" into "an intrusive form". It is obvious that the magnetic tape form makes the information more *usable* for the purposes contemplated by the plaintiff: mailing political information. But to equate usefulness with intrusiveness is to turn the FOIA on its head. A public body should not be allowed to thwart legitimate uses of public information by releasing the information in a format difficult or expensive to use. Releasing the requested names and addresses in handwritten form would make it even more difficult to read and use the information; surely that does not mean that a person requesting a printed copy can be given a handwritten copy because the latter is less usable and therefore less "intrusive"? Following that rationale would encourage a public body to meet its FOIA requests with the response that the actual public document or "writing" cannot be copied, but the agency will gladly produce the same "information" in a "less intrusive" form such as a foreign language, Morse Code, or hieroglyphics.

Finally, our colleague attaches little significance to the fact that the students listed on the tape failed to exercise not one but two opportunities to prevent their names from even appearing on the tape. It is argued that their consent was limited to release in printed form only. I cannot agree in

requester is willing to pay the higher cost. A political organization without the funds or expertise to decode a magnetic tape with a computer might request the more expensive printed format; we leave for such future case the question whether there is a legitimate reason why a public body should be allowed to deny such a request.

light of the unrestricted disclosure of "directory information" authorized under the Family Educational Rights and Privacy Act, 20 USC 1232g. That statute, as well as 45 CFR 99.37, does not restrict disclosure of names and addresses to any form, unless the student affirmatively forbids disclosure. Any student wishing to prevent identifying information from being disclosed on magnetic tape would have to "opt out", since the university could always make a discretionary disclosure not required by the FOIA. *Chrysler Corp v Brown,* 441 US 281; 99 S Ct 1705; 60 L Ed 2d 208 (1979). In fact, the university did sell the requested magnetic tape to a private corporation, which in turn used the tape in a profit-making enterprise, the publication of the 1978-1979 Student Directory. The effect of our colleague's opinion is that the university could sell or lease the same tape to other private corporations, to one political party and not another, to opponents of initiative proposals and not supporters,[32] or to incumbent candidates for the board of trustees and not challengers. Surely the students failing to opt out of the directory did not have any reasonable expectation that their "directory information" would be released only in certain forms. To the extent any such expectation exists, it can be easily eliminated in the future by this Court's opinion and any revised "opt out" notice given by the university.

---

[32] It is not necessary to accept as fact plaintiff's nonrecord allegations that the defendant has in the past provided another registered student organization with approximately 30,000 mailing labels from the student directory for a political mailing to oppose certain tax-cut proposals. It is sufficient to note that such political favoritism might well occur if the state is free to distribute useful political materials with unfettered discretion. The state FOIA prevents such political favoritism by declaring that "public records" belong to the people, not the public body; under the correct interpretation of the act, the potential for such abuse is eliminated because the requested "public record" must be made available to all persons equally.

We agree with the United States Supreme Court in *Dep't of Air Force, supra,* 425 US 361, that the exemptions from disclosure "must be narrowly construed". The Court must balance the public interest against the privacy interests with a "tilt" in favor of disclosure. *Disabled Officers Ass'n, supra,* 428 F Supp 457, and cases cited therein. We are obligated to remember that the alleged invasion of privacy must be "clearly unwarranted".[33] That standard charges the defendant Michigan State University with the heavy burden of proving that the requested document was exempt from the general rule of disclosure. That burden has not been met. We must dissent from the view that the requested magnetic tape may be exempted from disclosure under the exemption for a "clearly unwarranted" invasion of privacy.

## V

The Court of Appeals assigned as a separate reason for denying disclosure Mich Const 1963, art 9, § 18, which provides in pertinent part that:

"The credit of the state shall not be granted to, nor in aid of any person, association or corporation, public or private, except as authorized in this constitution."

---

[33] Compare the FOIA provision that exempts certain law enforcement records if the invasion of privacy resulting from disclosure would be "unwarranted". MCL 15.243(1)(b)(iii); MSA 4.1801(13)(1)(b)(iii).

The Legislature recognized that the FOIA would result in some decrease in personal privacy. The benefits of full disclosure were deemed more important than the concomitant loss of privacy. In this sense, then, "It is an extraordinary piece of antiprivacy legislation". Easterbrook, *Privacy and the Optimal Extent of Disclosure Under the Freedom of Information Act,* 9 J Legal Studies 775, 776 (1980). That we might prefer a little more privacy and a little less disclosure does not in any way reduce the deference owed to the Legislature's statutory expression of the opposite view.

Without engaging in an extended analysis of pre-1963 cases interpreting the analogous provision of earlier Michigan Constitutions, it is clear that in order to trigger application of art 9, § 18, there must be a lending of credit. *Gaylord v Gaylord City Clerk,* 378 Mich 273, 291-294; 144 NW2d 460 (1966); *Advisory Opinion re Constitutionality of 1966 PA 346,* 380 Mich 554, 563-564; 158 NW2d 416 (1968); *Advisory Opinion on Constitutionality of 1976 PA 295, 1976 PA 297,* 401 Mich 686, 701-703; 259 NW2d 129 (1977). In *Skutt v Grand Rapids,* 275 Mich 258; 266 NW 344 (1936), it appears that the city may have engaged in unauthorized borrowing by becoming party to repaying the indebtedness of others.

The opinion in *Younglas v Flint,* 345 Mich 576; 77 NW2d 84 (1956), was based not upon an unauthorized extension of credit, but upon the expenditure of tax funds for a nonpublic purpose. While the definition of "public purpose" for taxation purposes was once very narrow, the concept has been greatly enlarged in the modern era. See *Poletown Neighborhood Council v Detroit,* 410 Mich 616, 664; 304 NW2d 455 (1981) (RYAN, J., *dissenting).* The public purposes of the Freedom of Information Act are more than sufficient to justify the disclosure of public records on an equal basis to the general public for the incremental cost of copying, rather than the original cost of creating the public record. The general philosophy of the act is that public records "belong" to the public; we refuse to sanction nondisclosure on the theory that this is "proprietary" information "belonging" to the public body.

VI

Our reversal of the Court of Appeals on the

merits necessitates consideration of the attorney-fee issue raised by the plaintiff. The attorney-fee provision of the Michigan FOIA provides:

"(4) If a person asserting the right to inspect or to receive a copy of a public record or a portion thereof prevails in an action commenced pursuant to this section, the court shall award reasonable attorneys' fees, costs, and disbursements. If the person prevails in part, the court may in its discretion award reasonable attorneys' fees, costs, and disbursements or an appropriate portion thereof. The award shall be assessed against the public body liable for damages under subsection (5)." MCL 15.240(4); MSA 4.1801(10)(4).

Although the plaintiff prevailed at the circuit-court level by obtaining an order directing production of a copy of the magnetic tape containing student names and addresses, the circuit judge denied the requested attorney fees because

"the denial by MSU was not arbitrary or capricious and * * * the matter presented to the court was a valid question of first impression with substantial effects on the rights of third persons."

A motion to modify or amend the order to include an award of attorney fees was denied without further explanation.

It may be that the trial court denied the requested attorney fees on the theory that the defendant public body did not "arbitrarily and capriciously" violate the act within the meaning of MCL 15.240(5); MSA 4.1801(10)(5).[34] But a finding

[34] "(5) In an action commenced pursuant to this section, if the circuit court finds that the public body has arbitrarily and capriciously violated this act by refusal or delay in disclosing or providing copies of a public record, the court shall, in addition to any actual or compensatory damages, award punitive damages in the amount of $500.00 to the person seeking the right to inspect or receive a copy of

of an arbitrary and capricious violation is only necessary when the plaintiff seeks additional punitive damages in the amount of $500 pursuant to subsection (5). The absence of any such requirement from the attorney-fee provision of subsection (4) is a persuasive indication that the Legislature intended to allow the plaintiff reasonable attorney fees even if the public body's denial was not arbitrary and capricious but was in good faith. Under the Michigan FOIA, the court *"shall* award reasonable attorneys' fees, costs, and disbursements" to a prevailing plaintiff.[35]

The denial of attorney fees might also have been based upon the view, as urged by the defendant, that the plaintiff did not prevail but only prevailed "in part". It is argued that if the plaintiff only "prevails in part" the trial judge has the unfettered discretion to deny attorney fees altogether. While at first blush the statute is susceptible of that interpretation, a closer reading convinces us that the court's discretion is limited to awarding one of the two statutory alternatives; namely, "reasonable attorneys' fees, costs, and disbursements", or else "an appropriate portion thereof".

---

a public record. The damages shall not be assessed against an individual, but shall be assessed against the next succeeding public body, not an individual, pursuant to whose public function the public record was kept or maintained."

[35] Note that the attorney-fee provisions of the federal FOIA are substantially different:

"The court may assess against the United States reasonable attorney fees and other litigation costs reasonably incurred in any case under this section in which the complainant has substantially prevailed." 5 USC 552(a)(4)(E).

The federal provision differs from the Michigan provision in at least two material respects. First, it never *requires* that attorney fees be awarded, but instead grants the court broad discretion in awarding or denying attorney fees. Second, it requires that the plaintiff *substantially* prevail even to become eligible for an award of attorney fees, while our provision only requires that the plaintiff prevail in part. Federal authority interpreting the federal FOIA attorney-fee provision therefore provides little if any assistance in interpreting the Michigan statute.

The basic rule set forth in the statute is that a prevailing plaintiff is entitled to his attorney fees, costs, and disbursements. If the plaintiff prevails in full, it matters not a whit that the defendant's denial was not arbitrary or capricious, that the legal point was one of first impression, or that the defendant may have sought in good faith to protect the rights of third parties by violating the statute. If the plaintiff seeks disclosure of ten documents and the court orders disclosure of the ten documents, the plaintiff has prevailed and the court *shall* award reasonable attorney fees, costs, and disbursements.

But suppose the same plaintiff sought disclosure of one more document in addition to the ten disclosed and the court upheld the denial as to this eleventh document. Must we conclude that since the plaintiff has only prevailed "in part" the trial judge can exercise his "discretion" and deny any award of attorney fees? Such an approach would be contrary to the spirit of the FOIA, since it would encourage plaintiffs to include in their FOIA suit only those requests which they are absolutely certain will prevail. Alternatively, that approach would encourage the drastic fragmentation of FOIA claims. A separate complaint would be filed for each document requested (or, in this case, each deletion or restriction on the use of the information) so that the plaintiff could prevail "in full" as to each document ultimately disclosed. Such a procedure fails to comport with judicial efficiency, legislative intent, or common sense.

In the case of a plaintiff who "prevails in part", we read the statute to confer upon the court the discretion to award either the entire amount of plaintiff's reasonable attorney fees, costs, and disbursements *or* an appropriate portion thereof. The

appropriateness of the portion awarded is not to be measured by the good faith of the defendant or the novelty of the litigation, but rather by the amount of attorney fees, costs, and disbursements fairly allocable to the successful portion of the plaintiff's case.

In the instant case, the plaintiff prevailed on the critical point in dispute, namely, whether Michigan State University is required to release the requested student names and addresses in magnetic tape form. The deletions from the tape and restrictions upon use were stipulations suggested by the plaintiff to expedite the decision. Whether we conclude that the plaintiff prevailed in full or in part, it is clear that the amount of attorney fees allocable to the "denied" portion of the magnetic tape was negligible. If anything, the plaintiff's stipulation saved considerable court time and attorney fees for both sides; such stipulations should be encouraged rather than discouraged.

Accordingly, the decision of the Court of Appeals is reversed, and the case is remanded to the circuit court for a determination of reasonable attorney fees, costs, and disbursements.[36] We do not retain jurisdiction.

KAVANAGH and LEVIN, JJ., concurred with RYAN, J.

The late Justice BLAIR MOODY, JR., took no part in the decision of this case.

---

[36] Upon remand, the circuit court shall consider the plaintiff's claim for $500 punitive damages in light of 1978 PA 329, immediately effective July 11, 1978, which amended MCL 15.235(3); MSA 4.1801(5)-(3) to read as follows:

"Failure to respond to a request as provided in subsection (2) constitutes a final decision by the public body to deny the request. If a circuit court, upon an action commenced pursuant to section 10, finds that a public body has failed to respond as provided in subsection (2), and if the court orders the public body to disclose or provide copies of the public record or a portion thereof, then the circuit court shall assess damages against the public body as provided in section 10(5)."