### SKUTT v. CITY OF GRAND RAPIDS.

1. APPEAL AND ERROR—DISMISSAL OF BILL—EVIDENCE.
   On appeal from decree dismissing bill of complaint, allegations of bill and plaintiff's testimony are assumed to be true.

2. MUNICIPAL CORPORATIONS—POWERS.
   Municipal corporations created by the legislature have no inherent jurisdiction to make laws or adopt regulations of government; they are governments of enumerated powers, acting by a delegated authority, and can exercise those powers only which are expressly or impliedly conferred, and subject to such regulations or restrictions as are annexed to the grant.

3. CONTRACTS—MUNICIPAL CORPORATIONS—DELINQUENT TAXES—APPROPRIATION OF PUBLIC MONEY FOR PRIVATE ENTERPRISE.
   Arrangement, allegedly following resolution of city commission authorizing delinquent taxpayers to work out their taxes, between city manager's assistant and a private individual pursuant to which latter hired men to do work for city for less than his return through payment by way of credits received against unpaid taxes on property owned by his mortgagee, held, void as without authority in statute or of commission, and against public policy, since it amounts to an appropriation of public money to private enterprise (Const. 1908, art. 8, § 25, art. 10, § 12.; Grand Rapids Charter, title 5, § 21).

4. SAME—PUBLIC POLICY.
   Wherever any contract conflicts with the morals of the time, and contravenes any established interest of society, it is void, as being against public policy.

5. SAME—PUBLIC POLICY—APPLICATION OF PRINCIPLE.
   Principle that contracts in contravention of public policy are not enforceable should be applied with caution and only in cases plainly within the reasons on which that doctrine rests.

6. SAME—PUBLIC MONEY FOR PRIVATE ENTERPRISE.
   Contracts which involve an attempt to use public money for the furtherance of a private enterprise are void.

7. TAXATION—PURPOSE.
   Taxes are designed and collected for the purpose of supporting government and maintaining its activities and functions, and are levied to raise money for specific purposes.

8. SAME—MONEY—CHECKS.
   Money is always understood in the tax laws when nothing else is mentioned, checks being specifically allowed in one statute for convenience (1 Comp. Laws 1929, § 339).

9. COSTS—PUBLIC QUESTION—DELINQUENT TAXES—PAYMENT.
   In suit to require city to allow plaintiff's claim for work he hired men to do for city as a credit against delinquent taxes on property owned by his mortgagee, no costs are allowed on affirmance of dismissal of bill, a public question being involved.

FEAD and POTTER, JJ., dissenting.

Appeal from Superior Court of Grand Rapids; Taylor (Thaddeus B.), J. Submitted January 22, 1936. (Docket No. 125, Calendar No. 38,808.) Decided April 6, 1936.

Bill by Roger Skutt and wife against City of Grand Rapids, a municipal corporation, State Savings Association, a Michigan corporation, and others to set off credit on delinquent taxes for certain work performed and for other relief. Bill dismissed. Plaintiffs appeal. Affirmed.

*Linsey, Shivel & Phelps* (*John H. VanderWal,* of counsel), for plaintiffs.

*Ganson Taggart,* for defendant city and others.

Bushnell, J. This is an appeal from an order dismissing plaintiffs' bill of complaint. June 21, 1934, the city commission of Grand Rapids passed a resolution authorizing the employment of taxpayers who were delinquent in their 1929 and 1930 tax. This work was conducted under the supervision of the city manager and Louis Boynton, his assistant, was put in charge of the problem. A rate of $.387 per hour was fixed for this labor, but only as a credit upon delinquent taxes.

Plaintiff performed sufficient labor to offset his unpaid 1930 tax and received therefor a quitclaim deed from the city in satisfaction of this tax on his Duiker avenue property. He also owned property on Fourth street upon which defendant State Savings Association held a defaulted mortgage and the association was the owner of other properties upon which the 1930 tax was unpaid.

Plaintiff conceived the idea that by working out some of the association's unpaid taxes he could secure substantial credits from it upon his past-due mortgage. It is his claim that these facts were disclosed to Boynton, who suggested that the association make application to the city for such purpose, and that such an arrangement was entered into by the parties hereto.

The record shows that plaintiff then employed men to do this work for him; the association received credit therefor upon its unpaid taxes and in turn credited Skutt in the same amount upon his mortgage indebtedness. These men were paid by plain-

tiff at the rate of about $9 per week, $3 in cash and $6 in trade allowance at his second-hand store. The labor consisted of trimming trees, mowing lawns and other work for the city's park department, the city's allowance upon unpaid taxes for the work of one man for an entire week amounting to $18.55.

An injury to one of the workmen so employed raised the question of the liability of the city and the necessity of indemnification. The city attorney participated in this discussion and subsequently the city manager directed his assistant to ''stop the men that were working out their taxes.''

The testimony is in dispute as to whether the entire facts pertaining to this unusual arrangement were fully disclosed to the proper city officials before their approval of the plan. For the purpose of this appeal, however, we must assume the allegations of the bill and the testimony of plaintiffs to be true.

Skutt claims that there is still due him the sum of $1,030.58 and he prays that a decree be entered requiring the city to allow this credit to the association upon its unpaid taxes and that defendant association be required to give plaintiff credit in an equal amount on his mortgage.

The trial judge was of the opinion that the case involved a question of public policy and embodied his conclusions in these words in the decree:

''It appearing to this court that the alleged arrangement made by plaintiff with one Louis Boynton was not authorized by the city commission of the city of Grand Rapids; that no authority was delegated to said Boynton to make the arrangement, and that the same was contrary to action theretofore had by the city commission, and the charter of said city, and it appearing further that said Skutt had no con-

tractual relations with said city, and further that the carrying out of said arrangement with said Skutt would be an appropriation of public money for the benefit of said Skutt and contrary to public policy.

"And it further appearing that plaintiffs have not made out a case against the said defendants or any of them, now therefore," etc.

The decree dismissed the bill of complaint.

The quitclaim deeds from the city were given in the following manner. The city comptroller issued a request to the city commission in this form:

"This department respectfully recommends that quitclaim deeds be issued to the following parties, who are owners of the properties hereinafter described, which were sold for taxes as specified. The full amount of taxes, including interest and penalties in each case has been paid."

The commission then voted on the question and when its affirmative action was properly authenticated by the city clerk the deed issued.

The relief sought by plaintiff is confined to amounts which he claims are due from the city because of work performed by the men whom he employed. No questions as to plaintiff's own services are involved. He has been paid for his work or has received credits therefor.

We might dispose of the matter by merely concurring in the observation of the trial judge that: "Even if Mr. Boynton did advise plaintiff that he could hire men to work out taxes, no such authority was delegated to Mr. Boynton or to the city manager by the city commission and the assumption of such power conferred no legal rights upon the plaintiff."

Municipal corporations " 'have no inherent jurisdiction to make laws or adopt regulations of government; they are governments of enumerated powers, acting by a delegated authority; so that while the State legislature may exercise such powers of government coming within a proper designation of the legislative power as are not expressly or impliedly prohibited, the local authorities can exercise those only which are expressly or impliedly conferred, and subject to such regulations or restrictions as are annexed to the grant.' 1 Cooley's Constitutional Limitations (7th Ed.), p. 266." *City of Kalamazoo* v. *Titus,* 208 Mich. 252, 262.

We neither find any statutory authority for the arrangement in question nor does the city of Grand Rapids claim that its law-making body possesses authority to make or perform such a contract.

Appellants say, however, that:

"The trial court bases its conclusion solely upon the fact that the arrangement made was contrary to public policy and that public funds could not be used to carry out this purpose because the plaintiff would be enriched at the expense of the taxpayers."

We have considered the arguments in support of appellants' statement that "this holding on the part of the court is ridiculous and entirely unfounded."

The rule of public policy as enunciated by Mr. W. W. Story was adopted by this court in *McNamara* v. *Gargett,* 68 Mich. 454 (13 Am. St. Rep. 355). He said:

"Public policy is in its nature so uncertain and fluctuating, varying with the habits and fashions of the day, with the growth of commerce and the usages of trade, that it is difficult to determine its limits with any degree of exactness. It has never been defined by the courts, but has been left loose and free of definition in the same manner as fraud. This

rule may, however, be safely laid down, that wherever any contract conflicts with the morals of the time, and contravenes any established interest of society, it is void, as being against public policy." W. W. Story, Contracts (5th Ed.), § 675.

"The principle that contracts in contravention of public policy are not enforceable should be applied with caution and only in cases plainly within the reasons on which that doctrine rests." *Twin City Pipe Line Co.* v. *Harding Glass Co.,* 283 U. S. 353 (51 Sup. Ct. 476, 83 A. L. R. 1168) ; 6 R. C. L. p. 710.

We adopt as did the trial judge the following from *Pittsburg, C. C. & St. L. R. Co.* v. *Kinney,* 95 Ohio St. 64 (115 N. E. 505, L. R. A. 1917 D, 641, 643, Ann. Cas. 1918 B, 286) :

"What is the meaning of 'public policy?' A correct definition, at once concise and comprehensive, of the words 'public policy,' has not yet been formulated by our courts. Indeed, the term is as difficult to define with accuracy as the word 'fraud' or the term 'public welfare.' In substance, it may be said to be the community common sense and common conscience, extended and applied throughout the State to matters of public morals, public health, public safety, public welfare, and the like. It is that general and well-settled public opinion relating to man's plain, palpable duty to his fellow men, having due regard to all the circumstances of each particular relation and situation.

"Sometimes such public policy is declared by Constitution; sometimes by statute; sometimes by judicial decision. More often, however, it abides only in the customs and conventions of the people,—in their clear consciousness and conviction of what is naturally and inherently just and right between man and man. It regards the primary principles of equity and justice and is sometimes expressed under the title of social and industrial justice, as it is conceived by our body politic. When a course of con-

duct is cruel or shocking to the average man's conception of justice, such course of conduct must be held to be obviously contrary to public policy, though such policy has never been so written in the bond, whether it be Constitution, statute or decree of court. It has frequently been said that such public policy is a composite of constitutional provisions, statutes and judicial decisions, and some courts have gone so far as to hold that it is limited to these. The obvious fallacy of such a conclusion is quite apparent from the most superficial examination. When a contract is contrary to some provision of the Constitution, we say it is prohibited by the Constitution, not by public policy. When a contract is contrary to statute, we say it is prohibited by a statute, not by a public policy. When a contract is contrary to a settled line of judicial decisions, we say it is prohibited by the law of the land, but we do not say it is contrary to public policy. Public policy is the cornerstone—the foundation—of all Constitutions, statutes, and judicial decisions, and its latitude and longitude, its height and its depth, greater than any or all of them. If this be not true, whence came the first judicial decision on matter of public policy? There was no precedent for it, else it would not have been the first.''

''The public policy of the government is to be found in its statutes and when they have not directly spoken, then in the decisions of the courts and the constant practice of the government officials.'' *United States* v. *Trans-Missouri Freight Ass'n,* 166 U. S. 290 (17 Sup. Ct. 540).

So tested, the arrangement in question is contrary to public policy because it is manifestly against the public interest for plaintiff to profit by the labor of the unemployed in order to satisfy directly or indirectly the delinquent taxes upon the property of another and thereby secure credits upon his own mort-

gage indebtedness. Such an arrangement would be an appropriation of public money for the benefit of plaintiff.

Contracts which involve an attempt to use public money for the furtherance of a private enterprise are void. 3 McQuillin on Municipal Corporations (2d Ed.), § 1270. See Constitution of 1908, art. 10, § 12, art. 8, § 25, and title 5, § 21, of the city charter of Grand Rapids. See, also, *McManus* v. *City of Petoskey*, 164 Mich. 390, and *Freeland* v. *City of Sturgis*, 248 Mich. 190.

Furthermore, taxes are designed and collected for the purpose of supporting government and maintaining its activities and functions. Taxes are levied to raise money for specific purposes. Unless qualified in the context, the term "taxes" or "tax" is used in the sense of money—an exaction to be discharged in money. Money is always understood in the tax laws when nothing else is mentioned. *People, ex rel. Jones,* v. *Wright,* 34 Mich. 371; *People* v. *Seeley,* 117 Mich. 263; and 3 Cooley's Taxation (4th Ed.), § 1252. The only qualification found in the statutes is Act No. 228, Pub. Acts 1899 (1 Comp. Laws 1929, § 339), allowing payment by check for purposes of convenience.

The decree dismissing plaintiffs' bill of complaint is affirmed, but because of the public nature of the question involved, it is without costs.

North, C. J., and Butzel, Edward M. Sharpe and Toy, JJ., concurred with Bushnell, J.

Wiest, J. I concur in the result of Mr. Justice Bushnell's opinion.

Whether the owner of property may work out his taxes is not here involved.

I agree that plaintiff could not work out the taxes of the corporation. The right granted by the city, if valid, is personal to the property owner and may not be employed by another for profit.

FEAD, J. (*dissenting*). The charter of the city of Grand Rapids provides:

"(a) The city manager shall have charge of the administration of municipal affairs under the direction and supervision of the city commission.

"(d) Except as herein otherwise provided, he shall appoint and may remove all subordinate officers and employees of the city."

Louis Boynton is an officer or employee in the office of the city manager and is intrusted with executive powers and duties.

In 1933 the city commission "recommended" that the city manager employ delinquent taxpayers on public works and permit them to work out their taxes. Boynton had full charge of the employment.

In 1934 the city commission adopted a resolution.

"Report of the committee on service and the city manager relative to the subject of maintenance of the boulevards and parks during the summer months we recommend that provided the labor involved cannot be secured as a welfare relief project that same be secured by the employment of taxpayers who are delinquent in their 1929 and 1930 taxes and extending only to the amount of said delinquency and that the matter of giving out such work to these taxpayers be handled by the city manager."

Although a new city manager had been installed, Boynton continued in full charge of employment under the resolution. The taxpayers were hired by him and performed ordinary manual labor for the

city. There is no suggestion in the record that the work was "relief or made work" or was other than labor which the city needed and otherwise would have been obliged to pay for in money.

In the summer of 1934 plaintiff worked out his own taxes. He discovered that a tenant of a man too old to labor was working out his landlord's taxes. This gave him the idea of hiring men to work out taxes of the State Savings Association, his mortgagee, and getting credit on his debt to it. He propounded the proposition to Boynton, who agreed it was lawful. He submitted the matter to the association, whose taxes on a number of parcels of land were in arrears, and it acquiesced.

The application for the employment was made by the association, indorsed with the name of plaintiff in order to identify it, filed in the city manager's office and approved by Boynton in the city manager's name. The city was paying $.387 per hour. If a man worked a whole week for the city the association would receive credit for $18.55, and credit like amount to Skutt. Skutt hired men to do the work under the association's application and paid them $3 in cash and $6 in second-hand goods per week, thus making a profit of about $9 per week per man.

Under the arrangement some $1,200 were earned, credited by the city to the State Savings Association's taxes and credit in turn given by the association to Skutt on his mortgage. Thereafter some $1,010 were earned. About that time the city manager suspended the whole practice of employing taxpayers to work out taxes because of liability of the city in case any of them were injured. Skutt offered to provide compensation insurance for his men but the city refused to continue the work and denied the

association credit of the $1,010 for work already performed.

The State Savings Association is willing to credit the amount to Skutt on his mortgage if the city credits it the amount on its taxes, but not otherwise. The bill was filed to compel both credits to be made. The city defends principally upon the ground of lack of authority in Boynton to make the arrangement for the labor and upon the claim that it was *ultra vires* and against public policy.

The *modus operandi* under the resolution was that payrolls for the work were made up by the superintendent of parks, approved by the city manager and city commission, checks issued and turned into the city tax title office, receipts given to taxpayers, report made to the city commission, quitclaim deeds ordered by the commission and deeds issued by the mayor. The authority of the city commission so to provide for the payment of taxes by means of labor which the city has the power to hire and pay for is not denied. See *Veldman* v. *City of Grand Rapids, ante,* 100. The routine was followed as to the $1,200 of work done upon the application of the State Savings Association and a number of deeds issued to it.

The resolution of the city commission did not exclude corporate taxpayers from its benefits. Until the work was stopped, no one thought it did. Discrimination between classes of taxpayers ought not to be read into the resolution. Moreover, in the exercise of discretion conferred upon him, the city manager, through Boynton, authorized the State Savings Association to pay its taxes by labor. The city manager and city commission did not take the stand and testify that they did not know that the association was operating under the resolution. In

the absence of such denial, the least we can infer is that they knew of the fact and approved the construction of the resolution that a corporation could work out its taxes. The alternative is that the city manager and city commission must be convicted of a profound ignorance of the records of the city manager, of matters passing under their notice and of city affairs. The presumption is that officers are doing their duty.

A corporation would have to work out its taxes by hiring men to perform the labor. The city commission could not have been so naive as to think that a corporation would pay its men at the same rate as the city wage and without profit to itself. There would be no object to a corporation in such a proceeding as it might as well pay its taxes directly. The matter of some profit to a corporation cannot be said to have been wholly beyond the contemplation of the city. The fact that the association permitted Skutt to make the profit does not change the effect of the resolution.

Boynton's authority to exercise the powers of the city manager in connection with the employment is not denied by testimony. He was in charge of the work, so held out to the public, his acts were treated by the city manager as his own acts, by the city commission as the city manager's acts, the city had the benefit of the transaction and cannot put plaintiffs *in statu quo*.

In view of the above circumstances, it is too late to deny Boynton's authority and the validity of the arrangement with the State Savings Association unless it was wholly *ultra vires* or against public policy and beyond the power of even the commission to approve. *A. J. Smith Construction Co.* v. *City of Marine City*, 267 Mich. 367.

The claim of *ultra vires* and public policy has no other foundation than the fact that Skutt paid his men less than the city agreed to pay for their labor.

To avoid misunderstanding, perhaps it should be mentioned that we recognize the rule that fraud, collusion, corruption or concealment may avoid any public contract otherwise lawful. No such infirmity appears in this case. Wholly aside from what the other city officers actually knew, or ought to have known, or must be held to have known, it is undisputed that, in about a week after the arrangement and before any work was done upon the claim in controversy, Skutt frankly informed Boynton, the superintendent of parks and the city attorney of the details of his arrangement, including the wage he was paying his men. None of them suggested any legal or moral defect in the arrangement. He did not come into contact with the city manager or city commission until the work was stopped.

The city urges that the fact that Skutt was making a profit on the labor amounts to an appropriation of public moneys to private benefit and made the arrangement *ultra vires*. The principle and supporting authorities are sound but inapplicable. The public money was appropriated to pay for labor for the city, to the value of such labor and no more, a proper public charge. The contention would mean that no person lawfully could furnish labor or material to a city at a profit to himself.

It is said the arrangement was contrary to public policy in that it had a tendency to injure public service. However, after citing authorities to the rule, counsel neglected to indicate in what manner public service was or could have been injured,—it appearing that the men hired by Skutt rendered full value

to the city and that it is the business of the city officers to require full value.

It is suggested that approval of the instant arrangement would open the door to fraud as permitting officers to farm out city work to favorites. This assumes, without support in the record, that the city manager may not contract for labor on public works. Upon the same argument, any city contract is against public policy because it is open to fraud. It is the presence, not the possibility, of fraud which invalidates an agreement within the power of the city. The suggestion is no more reason for holding the present arrangement void as against public policy than for the same ruling upon any other contract which is entered into in good faith, without fraud, concealment, collusion or corruption, and under which the city receives full value.

It may be confessed that the case arouses an indignant desire to refuse Skutt the whole benefit of the wide disparity in wages. But legal rights do not rest upon such emotions. The unfairness is to his men, who are not here complaining. Perhaps, if the facts were disclosed, they are satisfied with their bargain. It is not unlawful to make a profit on labor or goods. Reduced to essentials, the proposition is that the city has received the full benefit of labor equal in value to the amount it agreed to credit the State Savings Association for such labor. In common honesty, it should carry out its bargain.

Decree should be reversed and one should be entered requiring the city to credit the earned amount upon the association's taxes and the association to credit plaintiffs upon their mortgage. Plaintiffs should have costs.

Potter, J., concurred with Fead, J.