CORRIGAN, J.
(concurring in part and dissenting in part). I concur with the majority in all respects but one. I dissent from its holding that the Court of Appeals erred in affirming summary disposition for defendant on plaintiffs’ request for the “side letters” to the settlement agreement. I believe that the letters were properly ruled exempt from disclosure under the “trade secrets or commercial or financial information” exemption of the Freedom of Information Act (FOIA), MCL *583 15.243(l)(f). The trial court did not abuse its discretion in holding that defendant recorded a description of the side letters within a reasonable time after they were submitted. Nor did the trial court err in holding that defendant satisfied the remaining requirements of the exemption.
I. PACTS AND PROCEDURAL HISTORY
Sandstone Associates Limited Partnership-A (Sandstone) sent the two “side letters” at issue to defendant on June 25, 2002, and July 23, 2002.[1] When plaintiffs first informally requested the side letters on October 16, 2002, defendant’s attorney responded on October 21, 2002, by saying that he was waiting for advice from Sandstone’s lawyers regarding whether to disclose the side letters because some of them “were submitted with an understanding of confidentiality.” Plaintiffs filed a formal FOIA request for the side letters on November 1, 2002, asking defendant to disclose “[a]ny and all side agreements entered into between the City of Novi and Sandstone and/or its attorneys or representatives^]” On November 26, 2002, after negotiating with Sandstone, defendant produced five side letters, but denied plaintiffs’ request in regard to
two documents representing commercial and/or financial information voluntarily submitted to the City of Novi for use in developing governmental policy in connection with the settlement of Oakland County Circuit Court litigation entitled [Sandstone Associates Limited Partnership-A v *584 City of Novi, Oakland Circuit Court Docket No. 95-501532-CK], as contemplated and required under MCL 15.243[(l)(f)].
On the same day, defendant recorded and filed with the city clerk descriptions of the two side letters that it had refused to disclose. Both of these side letters had been written by Sandstone and sent to defendant’s attorney and marked as confidential. In one letter, Sandstone named the prices it would pay to purchase plaintiffs’ (and others’) properties, assuming that the properties were free from deed restrictions (Letter 1). In the other letter, Sandstone identified which parcels of property (including plaintiffs’) have deed restrictions that give their owners the enforceable right to prohibit commercial use (Letter 2).
Following an in camera review of the two side letters and two affidavits submitted by defendant, the trial court determined that the letters were exempt from disclosure under the “trade secrets or commercial or financial information” exemption of the FOIA:
The court is satisfied that Defendant complied with each of the three listed requirements of MCL 15.243(l)(f) and thus disclosure of the two side letters would be inappropriate. The court finds that the two letters contain financial or commercial information of Sandstone’s voluntarily provided to Defendant by Sandstone in confidence. Further, the letters fall within the policy-making potential contemplated by the Legislature in drafting this exemption to the FOIA. They were intended to facilitate the Settlement Agreement and Consent Judgment and assist Defendant in making the policy decisions with regard to that settlement. The court finds that the content of the letters relates to Defendant’s deliberations on the selection of the best government policy for the potential expenditure of substantial sums of money and the retention of land for public use.
*585 The Court of Appeals affirmed, holding that defendant had satisfied all the requirements of the exemption.
II. ANALYSIS
I cannot conclude that the lower courts erred in holding that the two side letters are exempt from disclosure under the “trade secrets or commercial or financial information” exemption. When reviewing the application of an FOIA exemption, an appellate court reviews legal determinations de novo, factual findings for clear error, and discretionary determinations for an abuse of discretion. Herald Co, Inc v Eastern Michigan Univ Bd of Regents, 475 Mich 463, 471-472; 719 NW2d 19 (2006). The “trade secrets or commercial or financial information” exemption provides:
(1) A public body may exempt from disclosure as a public record under this act any of the following:
(f) Trade secrets or commercial or financial information voluntarily provided to an agency for use in developing governmental policy if:
(i) The information is submitted upon a promise of confidentiality by the public body.
(ii) The promise of confidentiality is authorized by the chief administrative officer of the public body or by an elected official at the time the promise is made.
(Hi) A description of the information is recorded by the public body within a reasonable time after it has been submitted, maintained in a central place within the public body, and made available to a person upon request. This subdivision does not apply to information submitted as required by law or as a condition of receiving a governmental contract, license, or other benefit. [MCL 15.243(l)(f) (emphasis added).]
*586 The burden is on the public body to demonstrate that the record is exempt from disclosure. MCL 15.240(4); Federated Publications, Inc v City of Lansing, 467 Mich 98, 108; 649 NW2d 383 (2002).
A. “A DESCRIPTION OF THE INFORMATION IS RECORDED BY THE PUBLIC BODY WITHIN A REASONABLE TIME”
What constitutes a “reasonable time” is a discretionary determination, as this Court described in Federated Publications, Inc, supra at 106-107. Thus, the trial court’s determination is subject to review for an abuse of discretion. Herald Co, supra at 471-472. This Court “cannot disturb the trial court’s decision unless it falls outside the principled range of outcomes.” Id. at 472. The trial court’s decision that defendant recorded a description of the side letters within a reasonable time after their submission to defendant, MCL 15.243(l)(f)(iii), did fall within the principled range of outcomes.
Even after defendant and Sandstone agreed to settle Sandstone’s multimillion dollar judgment against defendant, they continued to negotiate questions regarding deed restrictions on the subject property. Sandstone believed that certain of the seven side letters (including the two letters at issue) had been submitted upon defendant’s promise of confidentiality and hence were exempt from disclosure under the FOIA. While defendant agreed that some of the letters had been submitted upon a promise of confidentiality, it kept open the possibility that the letters might not be exempt under the FOIA. Defendant thus negotiated with Sandstone to determine which of the letters might be voluntarily disclosed under the FOIA. These negotiations continued until Sandstone eventually agreed to disclose five of the seven letters on November 26, 2002, the same day *587 that defendant recorded the descriptions and filed them with the city clerk. Defendant did not know whether it was going to assert an FOIA exemption regarding these side letters until its negotiations with Sandstone ended. If defendant had recorded the information contained in all of these letters and asserted the “trade secrets or commercial or financial information” exemption earlier than it did, Sandstone might not have agreed to disclose five of the letters.
The majority’s holding that defendant’s delay in recording descriptions of the side letters was unreasonable is inconsistent with the statutory language. By using the phrase “reasonable time,” the Legislature made clear that the permissible time period can vary. MCL 15.243(l)(i)(iii) does not define what constitutes a “reasonable time.” But this Court has defined “reasonable time” as follows: “By reasonable time is to be understood such promptitude as the situation of the parties and the circumstances of the case will allow. It never means an indulgence in unnecessary delay ....” Maley-Thompson & Moffett Co v Thomas Forman Co, 179 Mich 548, 555; 146 NW 95 (1914). Yet the majority disregards the word “reasonable” in the statute by holding that the circumstances surrounding defendant’s recording of the descriptions, including the negotiations between defendant and Sandstone, are “irrelevant,” ante at 574, and by concluding that the delay was unreasonable because, despite the circumstances, “defendant was still required to comply with the provisions of MCL 15.243(l)(f),” ante at 576. The majority holds that defendant was required to record descriptions earlier than it did “[h]owever inconvenient the recording requirement may have been to defendant and Sandstone,” ante at 575-576, and despite “whether defendant could later secure Sandstone’s permission to release the side letters,” ante at 576. In so holding, the *588 majority consciously shifts the focus away from whether defendant’s actions were reasonable in this case. To say, as the majority does, that the negotiations between defendant and Sandstone are irrelevant is to say that defendant was required to record the descriptions of the side letters within a certain unspecified time regardless of what time was reasonable under the circumstances. This is contrary to the text of the statute.
The majority holds that the negotiations between defendant and Sandstone were irrelevant to the statutory obligation to record descriptions of the side letters within a reasonable time because the statutory exemption’s recording requirement is intended to provide notice to the public. In support of this holding, the majority states that plaintiffs would never have discovered the existence of the side letters if they had not accidentally happened on a reference to the side letters.[2] The majority’s reasoning appears to be based on the faulty assumption that defendant never recorded the descriptions of the side letters. Defendant did give plaintiffs notice of the side letters when it recorded the descriptions on November 26, 2002. Thus, plaintiffs would have received notice within a reasonable time that defendant possessed the side letters even if plaintiffs had not discovered the letters before defendant recorded the descriptions. Further, the statute does not create a race between the requesting party and the public body. That plaintiffs discovered the existence of the side letters before defendant recorded the descriptions does not necessarily mean that defendant did not record the descriptions within a reasonable time. I do not question that the public body must record the *589 descriptions and give notice to the public in order to comply with MCL 15.243(l)(f)(iii). But the issue is not whether defendant gave notice that it possessed the side letters before plaintiffs discovered the side letters, but whether defendant gave notice within a reasonable time that it possessed the side letters. This case does not involve the situation cited by the majority in which the “requesting party [is required to] seek disclosure of a document of which it was unaware.” Ante at 576.
The majority believes that the four-month delay was unreasonable simply because it was too long. The majority effectively holds that whether the public body met the requirements of MCL 15.243(l)(f)(iii) depends only on the length of time the public body takes to record a description of the information, rather than whether that amount of time was reasonable under the circumstances. If the Legislature had not intended for the time to vary with the circumstances, it would have imposed a definite time limitation on the public body recording the description, rather than stating that the description must be recorded within a reasonable time.
Additionally, after having recited the appropriate standard of review, the majority nonetheless engages in a review de novo. Given the unusual situation presented by these facts, in which defendant waited to record the descriptions until negotiations regarding disclosure had concluded, the trial court accorded leeway in the recording process to defendant. There is good reason behind the abuse of discretion standard we articulated in Herald Co, supra at 471-472. The trial court is given the discretion to determine what amount of time is reasonable precisely so that it may take into account the public body’s recording of the description in each case and examine why the recording took the amount of time it did under the circumstances. Allow *590 ing the trial court the discretion to determine what amount of time is reasonable under the circumstances does not defeat the purpose of the recording requirements of the statute. Both the trial court and the Court of Appeals held that defendant recorded the description of the side letters within a reasonable time. This reasoned outcome accounts for defendant’s decision to record the descriptions after the conclusion of successful negotiations between defendant and Sandstone. The trial court’s determination fell within the principled range of outcomes. Id. at 472. The trial court did not abuse its discretion in determining that defendant recorded descriptions of the information within a reasonable time after they were submitted.
B. “SUBMITTED UPON A PROMISE OF CONFIDENTIALITY”
In one of the side letters (Letter 1), Sandstone stated that “[t]he terms of this letter are confidential under all respects, not subject to disclosure and would not be covered by any FOIA request.” The other side letter (Letter 2) was submitted with and related to Letter 1. Thus, Sandstone expressly stated that the letters were confidential. But to satisfy the exemption, the information must be submitted upon a promise of confidentiality by the public body. Defendant satisfied this requirement by offering the unrebutted affidavit of Ronald Hughes, the Sandstone partner who had signed the side letters. Hughes stated that defendant promised to keep the letters confidential before Sandstone sent them to defendant. He averred that the letters “were expressly submitted and conditioned on their confidentiality contemporaneous with their execution ....” Plaintiffs failed to offer any evidence in rebuttal. In light of Hughes’s uncontested affidavit, the trial court did not *591 err in finding no genuine issue of material fact that the letters were submitted upon defendant’s promise of confidentiality.
C. “AUTHORIZED BY THE CHIEF ADMINISTRATIVE OFFICER OF THE PUBLIC BODY OR BY AN ELECTED OFFICIAL’
Hughes also stated in his affidavit that “Sandstone understood that the promise of confidentiality was both known and authorized by the Mayor and City Manager, at the time of the letters^] execution, and Sandstone would not have submitted the letters absent such a promise of confidentiality from the City of Novi.” As noted, plaintiffs failed to rebut this affidavit. Thus, the trial court did not err in finding no genuine issue of material fact that the chief administrative officer or an elected official had promised confidentiality.
D. “FOR USE IN DEVELOPING GOVERNMENTAL POLICY”
Finally, I agree with the lower courts that the two side letters at issue contain financial or commercial information that was “for use in developing governmental policy.” MCL 15.143(l)(f). The FOIA does not define “governmental policy.” This Court has never interpreted this phrase in the context of the FOIA. Further, courts in other jurisdictions interpreting their own FOIAs have never defined this phrase.[3] It is thus difficult to form a precise definition of “governmental *592 policy.” Governments claim authority and responsibility over large groups of individuals, and the methods they employ to decide how to carry out their numerous functions vary widely. Nonetheless, this Court has defined “policy” in the employment contract context as “ ‘a definite course or method of action selected (as by a government, institution, group, or individual) from among alternatives and in the light of given conditions to guide and usu[ally] determine present and future decisions;... a projected program consisting of desired objectives and the means to achieve them ....’” In re Certified Question (Bankey v Storer Broadcasting Co), 432 Mich 438, 455-456; 443 NW2d 112 (1989), quoting Webster’s Third New International Dictionary, Unabridged Edition (1964); see also Silberman, Chevron —The intersection of law & policy, 58 Geo Wash L R 821, 822 (1990) (offering a similar definition).[4] This definition applies equally to the term “policy” in the *593 FOIA exemption at issue, and I would adopt it here. I emphasize that this definition does not encompass every decision regarding a course of action made by a governmental entity. Obviously, governmental bodies adopt many courses of action that do not guide present or future decisions. Such decisions may be categorized as “operational” decisions rather than “policy” decisions. Operational decisions concern routine, everyday matters and do not require evaluation of broad policy factors. See Rogers v State, 51 Hawaii 293, 296-298; 459 P2d 378 (1969) (interpreting a “discretionary function” exception to governmental immunity). Operational decisions may also be characterized as “the execution or implementation of previously formulated policy.” Hanson v Vigo Co Bd of Comm’rs, 659 NE2d 1123, 1126 (Ind App, 1996) (also interpreting a “discretionary function” exception to governmental immunity).[5]
*594 Although the Court of Appeals correctly ruled that the side letters were provided to defendant for use in developing governmental policy, the panel’s reasoning in reaching this conclusion was faulty. The panel stated that “[t]he information in the side letters clearly concerned public policy” because “[i]t related to how defendant intended to settle the Sandstone litigation, a situation with the potential to bankrupt defendant and seriously affect its residents.” Coblentz v Novi, 264 Mich App 450, 458; 691 NW2d 22 (2004). The agreement was of overarching importance to defendant and the development of defendant’s policy because it settled the Sandstone judgment against defendant, which could have bankrupted defendant and affected its residents by causing budget cuts and tax increases or assessments against each resident. Nonetheless, because the side letters were sent after defendant entered into the agreement with Sandstone, they did not affect whether defendant entered into the agreement, and accordingly did not affect whether defendant went bankrupt. The letters did not alter or void the agreement if defendant *595 was unable to clear the deed restrictions or convince plaintiffs to sell their properties. Because the agreement had already settled the Sandstone judgment when the side letters were sent, the danger of this judgment causing defendant to go bankrupt had abated. Thus, the side letters were not provided to defendant for use in developing its policy to discharge the Sandstone judgment and avoid bankruptcy.
Nonetheless, defendant did use the side letters in developing governmental policy. The agreement expressly provided that defendant would forfeit additional public land (either 4.8 or 9.6 acres at Sandstone’s option) if it failed to purchase plaintiffs’ properties or otherwise clear the deed restrictions on the properties. Thus, the agreement demonstrates that before the side letters were sent, defendant had already made the policy decision that it would agree either to find a way to remove the deed restrictions on plaintiffs’ property or to relinquish additional parkland. But at the time defendant entered the agreement, it had not yet decided which of these two alternatives it would choose. The agreement itself contained no policy to assist in this decision. Because the decision whether to remove the deed restrictions or forfeit additional parkland was not a routine decision that merely required application of policy developed in the agreement, defendant had a remaining policy decision to make after it entered into the agreement. That defendant had already agreed on the two alternatives before the side letters were sent did not alter defendant’s need to develop policy in order to choose between these two alternatives.
The side letters confirm the deed restrictions on the properties and the amount Sandstone would pay defendant for plaintiffs’ properties once they were free from restrictions. By offering in the letters to advance all or *596 part of the money to defendant to purchase plaintiffs’ properties, Sandstone sought to influence defendant’s decision whether to purchase plaintiffs’ properties, pay plaintiffs to waive the right to enforce their deed restrictions, or forfeit additional public land to Sandstone. Because disclosure of the letters would reveal to plaintiffs the amount Sandstone was willing to pay for their properties, it would also affect defendant’s ability to purchase plaintiffs’ properties. Defendant’s decision regarding whether to attempt to purchase plaintiffs’ properties or try to lift the deed restrictions on the properties not only directly affected plaintiffs individually, but it also affected the residents of the city because it determined whether defendant would be forced to forfeit several acres of property set aside for public use. If defendant decided to purchase plaintiffs’ properties, it would result in large expenditures of public funds, which would affect defendant’s budget and its residents. On the other hand, if defendant was unable to lift the deed restrictions or decided not to purchase plaintiffs’ properties, defendant would forfeit additional public property to Sandstone. The loss of this additional land would affect all of defendant’s residents.[6]
Regardless of defendant’s ultimate decision, the information in the side letters was provided for use in guiding defendant’s management of public affairs. The letters affected a budgetary decision concerning allocation and substantial expenditure of public funds to retain public land. Thus, the letters were provided to *597 defendant to develop a course of action that would materially affect the future of its citizens. The letters did not involve a mere operational decision regarding a routine matter for which a policy was already in place. Defendant’s decision on how to deliver its governmental functions within its budget obviously constituted a policy decision. Thus, the Court of Appeals did not err in holding that the side letters contained financial or commercial information provided to defendant for use in developing governmental policy.
III. CONCLUSION
I dissent from the majority’s conclusion that plaintiffs were entitled to disclosure of the side letters. In my opinion, the trial court did not abuse its discretion in determining that defendant recorded descriptions of the side letters within a reasonable time after they were submitted. Because defendants met all of the other requirements of the “trade secrets or commercial or financial information” exemption of the FOIA, the side letters were exempt from disclosure.

 Defendant and Sandstone entered their agreement settling Sandstone’s multimillion dollar judgment against defendant on June 25,2002. Sandstone dated and sent the first draft of the first side letter to defendant’s attorney on the same day. Sandstone sent a revised version of this letter, along with the other side letter at issue, to defendant on July 23, 2002.

 Plaintiffs learned of the side letters upon examining a nonfinal draft of the agreement that was voluntarily disclosed by defendant.

 Other jurisdictions have interpreted their own versions of the “trade secrets or commercial or financial information” exemption. None of these jurisdictions has statutes that include the “governmental policy” language found in Michigan’s exemption. For example, numerous federal courts have interpreted the federal FOIA provision that exempts from disclosure “trade secrets and commercial or financial information obtained from a person and privileged or confidential!.]” 5 USC 552(b)(4). But the federal exemption does not require that the information he provided “for use in developing governmental policy.”

 I distinguish the phrase “governmental policy” from the phrase “public policy” because these phrases are generally used to convey different meanings. In Terrien v Zwit, 467 Mich 56, 68 n 13; 648 NW2d 602 (2002), this Court declined to define “public policy,” but held that “public policy is defined by reference to the laws actually enacted into policy by the public and its representatives.” As the Court observed in Skutt v Grand Rapids, 275 Mich 258, 264; 266 NW 344 (1936), quoting Pittsburgh, C, C & St L R Cov Kinney, 95 Ohio St 64; 115 NE 505 (1918):
“What is the meaning of ‘public policy?’ A correct definition, at once concise and comprehensive, of the words ‘public policy’, has not yet been formulated by our courts.... In substance, it may be said to be the community common sense and common conscience, extended and applied throughout the State to matters of public morals, public health, public safety, public welfare and the like. It is that general and well-settled public opinion relating to man’s plain, palpable duty to his fellow men, having due regard to all the circumstances of each particular relation and situation.”
Thus, “public policy” is used as a basis for governmental decisions, rather than being a “course or method of action” for making present or future decisions.

 In interpreting the “discretionary function” exception to its governmental immunity statute, the Arizona Court of Appeals offered contrasting examples of operational, as opposed to policy, decisions:
By way of illustration, a decision by the district hoard to construct a playground at a school and allocate funds for that purpose would be a policy decision protected by immunity. Deciding what specific pieces of equipment to have on the playground would not be a policy decision, but rather would he an operational level decision. See, e.g., Warrington v. Tempe Elementary Sch. Dist., [187 Ariz 249, 252; 928 P2d 673 (Ariz App, 1996)] (school district’s decision regarding placement of bus stop is an operational level decision); Evenstad [v State], 178 Ariz. [578] at 582-84, 875 E2d [811] at 815-17 (App. 1993) (issuance of driver’s license by MVD is an operational level decision; prescribing rules for issuance is making of policy); Rogers v. State, 51 Haw. 293, 296-98, 459 P2d 378, 381 (Haw. 1969) (operational level acts concern routine, everyday matters, not requiring evaluation of broad policy factors; operational acts include kinds of road signs to place and which center line stripes to repaint); Stevenson v. State Dept. of Transp., 290 Or. 3, 9-12, 619 P2d 247, 251-52 (Or. 1980) (decision to build a highway rather than a railroad track is exercise of governmental *594 discretion or policy judgment entitled to immunity; planning and design of the road does not involve use of discretion in the sense that a policy decision is required). [Schabel v Deer Valley Unified School Dist No 97, 186 Ariz 161, 166; 920 P2d 41 (Ariz App, 1996).]
See also Gutbrod v Hennepin Co, 529 NW2d 720, 723 (Minn App, 1995) (citations omitted) (“Planning level decisions ... involve questions of public policy and the balancing of competing policy objectives.... [Operational level decisions relate ‘to the ordinary day-to-day operations of the government’ and involve the exercise of scientific or professional judgment.”).
I recognize that the FOIA exemption at issue is worded differently than, and applied differently from, the governmental immunity statutes in these cases. Nonetheless, I find persuasive the analyses of “policy” versus “operational” in these cases in interpreting what constitutes “policy” within the meaning of Michigan’s “trade secrets or commercial or financial information” exemption.

 Thus, this case is distinguishable from Herald Co, Inc v Tax Tribunal, 258 Mich App 78, 85; 669 NW2d 862 (2003), in which the Court of Appeals held that the “trade secrets or commercial or financial information” exemption did not apply because the single individual tax determination “lack[ed] the policy-making potential contemplated by the Legislature in drafting this exemption to the FOIA.”